**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JESSE JAMES ANDREWS, *Petitioner-Appellant/ Cross-Appellee*, v. RON DAVIS, *Respondent-Appellee/ Cross-Appellant.* | Nos. 09-99012 09-99013 D.C. No. 2:02-CV-08969-R OPINION |

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted En Banc September 25, 2018
Pasadena, California

Filed December 16, 2019

Before: Sidney R. Thomas, Chief Judge, and Ronald M.
Gould, Marsha S. Berzon, Johnnie B. Rawlinson, Jay S.
Bybee, N. Randy Smith, Mary H. Murguia, Jacqueline H.
Nguyen, Paul J. Watford, John B. Owens and Michelle T.
Friedland, Circuit Judges.

Opinion by Judge Murguia;
Partial Concurrence and Partial Dissent by
Judge N.R. Smith

# SUMMARY*

## Habeas Corpus/Death Penalty

In an appeal and cross-appeal arising from Jesse Andrews's habeas corpus petition challenging his California conviction and death sentence on three counts of murder, the en banc court affirmed the district court's grant of sentencing relief based on ineffective assistance of counsel, dismissed as unripe Andrews's Eighth Amendment claim challenging California's lethal-injection protocol, and denied a request to certify for appeal Andrews's uncertified claims.

Regarding the performance prong in *Strickland v. Washington*, 466 U.S. 668 (1984), the en banc court held that the California Supreme Court unreasonably applied clearly established federal law in concluding that Andrews received constitutionally adequate counsel at the penalty phase. The en banc court held that the only reasonable interpretation of Supreme Court precedent and the facts of this case lead to the following conclusions: (1) that Andrews's attorneys failed in their duty to undertake a reasonable investigation at the penalty phase; (2) that their choices cannot be rationalized as "strategic" or "tactical;" and (3) that any reasonably competent attorney would have discovered and introduced substantial and compelling mitigating evidence that existed. The en banc court held that no fair-minded jurist would conclude otherwise.

Regarding *Strickland*'s prejudice prong, the en banc court held that the California Supreme Court's conclusion—

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that Andrews suffered no prejudice from the omission of the substantial and compelling evidence that his attorneys should have introduced but didn't—was objectively unreasonable. The en banc court held that, without having heard the substantial and compelling mitigating evidence, the jury could not fairly gauge Andrews's moral culpability at sentencing, and that no fair-minded jurist would disagree.

Concurring in part and dissenting in part, Judge N.R. Smith, joined by Judges Rawlinson and Owens, wrote that the majority essentially evaluated the merits *de novo* rather than with the appropriate deference under the Antiterrorism and Effective Death Penalty Act; and that the California Supreme Court reasonably concluded that Andrews was not prejudiced by his counsel's deficient performance during sentencing.

## COUNSEL

Michael Burt (argued), Law Office of Michael Burt, San Francisco, California, for Petitioner-Appellant/Cross-Appellee.

Xiomara Costello (argued), Keith H. Borjon, and James William Bilderback II, Supervising Deputy Attorneys General; A. Scott Hayward, Sarah J. Farhat, and Shira Siegle Markovich, Deputy Attorneys General; Michael J. Mongan, Deputy Solicitor General; Lance E. Winters and Ronald S. Matthias, Senior Assistant Attorneys General; Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General; Edward C. DuMont, Solicitor General; Xavier Becerra, Attorney General; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee.

**OPINION**

MURGUIA, Circuit Judge:

Jesse Andrews was sentenced to death by a jury that only knew the State's view of him. He was, according to the prosecutor, a "vicious animal." The jury, however, did not know—because it was never told—anything about Andrews's upbringing in a segregated and impoverished area of Mobile, Alabama. Andrews's counsel did not tell the jury that Andrews, as a child, had been confined at the Alabama Industrial School for Negro Children known as "Mt. Meigs"—a segregated, state-run institution that, in the words of one witness, was a "slave camp for children." The jury was not told that, during these formative years, Andrews was repeatedly subject to brutal abuse at the hands of his state custodians. It was not told that, from the age of fourteen, Andrews was in the custody of Alabama state institutions so degrading that federal courts later found the conditions in those institutions violated the Eighth Amendment's prohibition on cruel and unusual punishment. Nor was the jury told that, in the view of mental health experts, the severe abuse Andrews suffered made his subsequent criminal behavior understandable and predictable.

In short, Andrews's counsel did nothing to counterbalance the prosecutor's view of their client or to portray Andrews as a human being, albeit one who had committed violent crimes. In fact, Andrews's counsel introduced almost no evidence in mitigation at the penalty phase. Despite this record of deficient representation, the California Supreme Court concluded that, under *Strickland v. Washington*, 466 U.S. 668 (1984), Andrews received constitutionally adequate representation at the penalty phase.

That decision is fundamentally and objectively unreasonable.

Indeed, it is unconscionable and unreasonable to uphold a sentence of death when the jury never heard readily available mitigating evidence of the magnitude present here. This is especially so when, as here, counsel failed to present *any* meaningful evidence in mitigation. Counsel's performance at the penalty phase of Andrews's trial was so deficient that it failed to "fulfill the role in the adversary process that the [Sixth] Amendment envisions," undermining all confidence in the sentence. *Id.* at 688.

To be sure, our deference to state court decisions is at its zenith on federal habeas review. *See Harrington v. Richter*, 562 U.S. 86, 105 (2011). Indeed, federal courts are barred from granting habeas relief as to state court convictions if jurists of reason could debate the correctness of the state court's decision, and a "state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* at 101. That deference, however, "does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

This case presents the type of "extreme malfunction[]" in the operation of a state's criminal justice system that justifies the intervention of a federal habeas court. *Richter*, 562 U.S. at 102 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)). We therefore affirm the district court's grant of sentencing relief based on Andrews's ineffective assistance of counsel claim. The California Supreme Court unreasonably applied clearly established federal law when it concluded that Andrews received constitutionally adequate representation at the

penalty phase of his trial. Unless the State elects to reprosecute the penalty phase, the writ will issue.

# I

# A

The facts of Andrews's crimes inspire little sympathy. In December 1979, police were called to a Los Angeles apartment, where officers located the bodies of three murder victims—Preston Wheeler, Patrice Brandon, and Ronald Chism. *In re Andrews*, 52 P.3d 656, 657 (Cal. 2002). Police later arrested Charles Sanders in connection with the crime. *People v. Andrews*, 776 P.2d 285, 288 (Cal. 1989). Sanders entered a plea agreement and gave a statement describing the murders and implicating Andrews. *Id.* at 288–89. Andrews was arrested and charged in June 1982. *Id.* at 295–96.

The evidence presented at trial connecting Andrews to the murders primarily consisted of Sanders's testimony, the testimony of another witness, and fingerprint and palm print evidence. *In re Andrews*, 52 P.3d at 658. Sanders testified that he and Andrews devised a plan to rob Wheeler, a drug dealer. *Id.* After entering Wheeler's apartment and smoking marijuana with him, Sanders and Andrews drew their weapons, tied up Wheeler and Brandon, and began to search the apartment for drugs and money. *Id.* When their search proved unfruitful, Andrews said that he would "make Brandon talk," and he "dragged her into the kitchen and closed the door." *Id.* (quoting *Andrews*, 776 P.2d at 288). Sanders testified that he heard Andrews "hitting Brandon and later heard sounds as though they were having sex." *Id.*

After Andrews came out of the kitchen, Sanders began searching for drugs in the attic. *Id.* Sanders testified that he then heard two shots and, when he came down from the attic,

Andrews told him he had shot Wheeler, at close range, because Wheeler had tried to escape. *Id.* Sanders also testified that Andrews told him he had killed Brandon before leaving the kitchen. *Id.*

While Sanders and Andrews were cleaning the apartment, Chism "knocked on the door and asked if everything was all right." *Id.* According to Sanders, Andrews "then hit Chism on the head, tied him up, and took him into the bathroom," where Andrews strangled him. *Id.* (internal quotation mark omitted). Sanders then saw Andrews reenter the kitchen and choke Brandon with a wire clothes hanger. *Id.*

The defense's guilt-phase strategy consisted primarily of "attempts to undermine Sanders's credibility." *Andrews*, 776 P.2d at 289. Two inmates who had been in jail with Sanders testified that he made statements suggesting that he planned to fabricate a story to shift the blame for the murders to someone else. *Id.* Andrews did not testify. *Id.*

The jury deliberated for three days before finding Andrews guilty of the first-degree murders of Wheeler, Brandon, and Chism. Andrews was also convicted of rape, sodomy by a foreign object, and robbery. *In re Andrews*, 52 P.3d at 658–59. And the jury found four special circumstances to be true—prior murder, multiple murder, robbery-murder, and rape-murder—making Andrews eligible for the death penalty. *Id.* at 659.

The penalty-phase presentations for both the prosecution and the defense were limited. The prosecution's evidence consisted of a stipulation and two exhibits. *Id.* The exhibits were photographs of two of the victims that had been excluded from the guilt phase because they were unduly inflammatory. *Id.* The stipulation established Andrews's

birthday (showing that Andrews was twenty-nine years old at the time of the murders), and that Andrews had pleaded guilty in Alabama to the crimes of armed robbery, escape, and robbery. *Andrews*, 776 P.2d at 300. The prosecution gave a short closing presentation focused on the violent circumstances of the crimes that repeatedly mentioned Andrews's prior convictions for violent offenses.

The defense's evidence, admitted by stipulation, consisted of two "sworn statements describing the circumstances surrounding [Andrews's] prior Alabama murder conviction." *Id.* According to the statements, Andrews and his accomplice "entered a grocery store and announced a robbery. When the store clerk placed his hand down the front of his apron, [Andrews's] companion fired three gunshots, killing" the store clerk. *Id.*

After calling no witnesses and introducing only a brief description of Andrews's previous crimes into evidence, Andrews's counsel gave a short, rambling closing statement—spanning just nine pages of trial transcript.[1] Counsel's statement overwhelmingly focused on Andrews's age. In fact, counsel repeatedly suggested that the "fact alone that [Andrews was] only [twenty-nine] years old can be sufficient in mitigation for you to consider. That alone." Counsel's brief presentation also veered from topic to topic—from the security at Folsom prison, to Andrews's secondary role in his prior murder conviction, to the fact that Sanders, as well as defendants in other high-profile murders, did not receive death sentences for their crimes.

The jury returned a death verdict on each of the three murder counts. *In re Andrews*, 52 P.3d at 658–59. The

---

[1] A copy of this portion of the trial transcript is attached as Appendix A.

California Supreme Court affirmed the conviction and sentence on direct appeal on August 3, 1989. *Andrews*, 776 P.2d at 285, 288.

## B

Andrews later filed petitions for state post-conviction relief before the California Supreme Court. One claim asserted that, at the penalty phase of his trial, Andrews received ineffective assistance from his counsel—Gerald Lenoir and Hal Miller—based on their failure to investigate avenues of mitigation and to present mitigation evidence. *In re Andrews*, 52 P.3d at 659.

## 1

The California Supreme Court appointed a state superior court judge to conduct a reference hearing[2] and to take evidence and make findings of fact on a series of questions related to Andrews's ineffective assistance of counsel claim. *Id.* The referee received testimony from more than fifty witnesses over multiple years. *Id.* at 660 & n.2.

The referee determined that "[n]o character evidence and virtually no mitigation was presented at the penalty trial." However, through the use of "standard investigative techniques" and "simple persistence," Andrews's counsel

---

[2] Under California law, "[b]ecause appellate courts are ill-suited to conduct evidentiary hearings, it is customary for appellate courts to appoint a referee to take evidence and make recommendations as to the resolution of disputed factual issues." *People v. Romero*, 883 P.2d 388, 393 (Cal. 1994). The referee acts as "an impartial fact finder for [a California appellate court]." *In re Boyette*, 301 P.3d 530, 546 (Cal. 2013) (internal quotation marks omitted). Although the referee's factual findings are not binding on the court, the findings are "entitled to great weight where supported by substantial evidence." *Id.* (internal quotation mark omitted).

could have identified and presented a "large number of witnesses" in mitigation, "painting an in-depth portrait" of Andrews.

Based on the referee's findings, that portrait would have revealed that Andrews was born and raised in a segregated and poor part of Mobile, Alabama in the 1960s. *In re Andrews*, 53 P.3d at 660. His parents were alcoholics who separated soon after his birth, leaving Andrews and his siblings in the care of his grandparents. *Id.* When Andrews was approximately ten years old, his grandfather—described by the referee as a "pivotal figure" in his life—died. *Id.* (internal quotation marks omitted). After his grandfather's death, Andrews became "more withdrawn, [his] truancy increased significantly, and he started to get involved in minor legal scrapes." At age fourteen, as a result of his involvement in a car theft, Andrews was committed to Mt. Meigs. *In re Andrews*, 53 P.3d at 660.

The conditions at Mt. Meigs were "appalling." *Id.* A federal district court judge—who had participated in litigation pertaining to the conditions at Mt. Meigs before joining the bench—testified at the reference hearing that "the institution was a penal colony for children." *Id.* at 677 (Kennard, J., dissenting) (internal quotation mark omitted). Another witness, a former juvenile probation officer—who testified before Congress and state legislatures about juvenile facilities around the country—described Mt. Meigs as a "slave camp for children." *Id.* (internal quotation marks omitted). He testified that the children there were "beaten all the time with, among other things, broomsticks, mop handles, and fan belts" and that Mt. Meigs was "by far, by far . . . the worst facility" he had ever seen. *Id.* (internal quotation marks omitted).

The former probation officer added that the children committed to Mt. Meigs in the 1960s had "no chance of rehabilitation" and "came out much worse" than when they entered.  Indeed, the institution was "not designed for rehabilitation."  There were "no vocational programs, no counseling, and virtually no education" available.  *In re Andrews*, 53 P.3d at 677.  Instead, children were "put to work in the fields, picking cotton and tending vegetables." *Id.*  At night, there was little supervision, leading to "a lot of sexual abuse of children."  *Id.* (internal quotation marks omitted).

Thirteen of the witnesses who testified at the reference hearing had been committed to Mt. Meigs, and seven were there at the same time as Andrews.  *Id.*  Each testified to "horrific conditions," describing beatings with "sticks (sometimes lead-filled), bullwhips, and fan belts, often for trivial matters."  *Id.*  These witnesses repeated one particularly cruel example of abuse:  When a child was disobedient in the fields or failed to pick his quota of cotton, an overseer would "poke a hole in the ground and order him to lie down, to pull down his pants, and to stick his penis into the hole.  The overseer would then beat the boy's thighs with a stick, often until the skin burst open.  One witness remembered seeing [Andrews] beaten in this manner."  *Id.*

In 1971, a federal district court in Alabama determined that "the frequent and indiscriminate use of corporal punishment" by school personnel at Mt. Meigs demonstrated a "callous indifference to children's safety," providing a basis for liability for cruel and unusual punishment under the Eighth Amendment.  *Stockton v. Ala. Indus. Sch. for Negro Child.*, No. 2834-N (M.D. Ala. July 23, 1971) (order adopting proposed findings of fact and conclusions of law dated July 19, 1971).

As the referee concluded, once Andrews entered Mt. Meigs at age fourteen,

> [h]is academic schooling from that point was virtually nonexistent, and he was subjected to beatings, brutality, inadequate conditions and sexual predators . . . .  He was rarely visited by family[, and his] passiveness and small physique caused him to be a target of older, tougher boys, from whom no protection or separation was provided.

Because of his young age and slight build, that targeting included "substantial sexual pressure." *In re Andrews*, 52 P.3d at 677 (Kennard, J., dissenting).  And, according to Andrews's mother, whatever "happened at that industrial school [] ruined [Andrews's] life."

Following his release from Mt. Meigs, Andrews "became withdrawn and uncommunicative." *In re Andrews*, 53 P.3d at 661 (majority opinion).  "Over his family's objections, he began to associate with older, streetwise boys, including Freddie Square, a more sophisticated young man with manipulative and criminal tendencies." *Id.* (internal quotation mark omitted).  Just months after his release from Mt. Meigs, "at Square's instigation," Andrews and Square robbed a grocery store. *Id.*  During the robbery, Square shot and killed the store clerk. *Id.*  Shortly thereafter, Andrews was convicted of murder and robbery for his role in the crime. *Id.*

Andrews spent the next ten years in various jails and prisons throughout the state. *Id.*  The referee described the conditions in Alabama as

> abysmal, characterized by severe overcrowding, racial segregation, substandard facilities, no separation of the tougher inmates from younger or smaller inmates, constant violence, the persistent threat of sexual assaults and the constant presence of sexual pressure, the availability and necessity of weapons by all inmates, and degrading conditions in disciplinary modules.

*Id.* (internal quotation marks omitted).

One expert witness described the Alabama prison system at the time as a "national disgrace" and as either "the worst" or "among a handful of the worst" prison systems in the United States. *Id.* at 678 (Kennard, J., dissenting) (internal quotation marks omitted). During the time Andrews was incarcerated in Alabama, the prison conditions there, like the conditions in Mt. Meigs, were found to violate the Eighth Amendment. *Id.* at 676; *see also Pugh v. Locke*, 406 F. Supp. 318, 322–31 (M.D. Ala. 1976).

According to the testimony of a former physician at one facility, the "conditions at the overcrowded and rat-infested prisons [were] 'so debilitating' that they deprived inmates of 'any opportunity to rehabilitate themselves or even to maintain the skills already possessed.'" *In re Andrews*, 52 P.3d at 678 (Kennard, J., dissenting). When Andrews entered the prison system, "it was newly integrated and many of the [w]hite prison guards resented the [b]lack prisoners, whom they called 'things' and 'niggers.'" *Id.*

Sexual assaults in the prisons were common and, according to one expert witness, "[t]he prevailing view among both staff and inmates was that an inmate who was

raped 'deserved' it because he was 'not man enough to fight.'" *Id.* Although the precise details were unclear, Andrews's post-conviction counsel presented evidence at the state court hearing that Andrews was "repeatedly raped in prison." *Id.* at 679–80 (reviewing testimony describing four separate sexual assaults). Another witness, a former inmate in prison with Andrews, described him as a "little sheep among wolves, a baby among a bunch of grownups." *Id.* at 679 (internal quotation mark omitted).

And yet, despite the violence surrounding Andrews, the referee found that

> it was undisputed that [Andrews] was rarely the instigator of violence. On the contrary, the evidence showed that he avoided violence and appeared to adjust well when the structure permitted and that he would continue to do so. His small stature made him the target of more violent inmates in virtually every institution in which he was housed. However, when circumstances permitted, he tended to hold positions of responsibility. To the extent that he was involved in prison violence personally, the evidence remains consistent that he was the prey rather than the predator.

*Id.* (quoting referee's findings).

Finally, the referee received "[e]xtensive psychiatric testimony" from several expert witnesses who described Andrews as suffering from a range of mental disorders, including post-traumatic stress disorder and organic brain impairment. *Id.* at 661–62 (majority opinion) (internal quotation mark omitted). Those witnesses testified that the

impact of Andrews's experiences in Alabama's correctional institutions "made his behavior understandable and his reincarceration predictable." *Id.* at 662 (quoting referee's findings).

After hearing evidence about the investigative steps that were required to uncover this background information, the referee found none of it "called for any extraordinary efforts beyond simple persistence." *Id.* (internal quotation marks omitted). The referee categorized the available mitigation evidence into three "general and partially overlapping" areas: (1) "the circumstances of [Andrews's] upbringing"; (2) "the impact of the correctional facilities in Alabama"; and (3) "the psychiatric aspects of [Andrews's] history." *Id.* According to the referee, counsel "could readily have learned about [Andrews's] upbringing from their contact with his mother" and other family members who were willing to provide information or to testify. *Id.* "Several areas of inquiry were available relating to [Andrews's] experiences in the correctional system in Alabama," including review of court files of prior convictions, prison records, and juvenile records. *Id.* (internal quotation mark omitted). Standard "[l]egal research would have produced information concerning lawsuits and prison conditions that were a matter of public record as to conditions in the penal system during that period of time." As for the availability of Andrews's mental health history, the "[r]outine appointment of psychiatric experts" would have provided information to dictate whether any additional steps were necessary. *In re Andrews*, 52 P.3d at 662 (alteration in original) (quoting referee's findings).

The referee also described the insufficient investigative steps that counsel actually took. She explained that Andrews's counsel "made only 'limited' efforts to gather

penalty-phase evidence on [Andrews's] behalf." *Id.* at 663. They did not use investigators at the penalty phase, nor did they have Andrews "examined by a psychologist, psychiatrist, or any other mental health expert." *Id.* The referee also found that they "were severely impeded" in their ability to represent Andrews "by their heavy caseloads, conducting back-to-back capital cases before and after" Andrews's trial. *Id.* at 664 (quoting referee's findings).

Andrews's counsel made two trips to Mobile as part of their penalty-phase investigation, each lasting a single day. On their first trip, counsel "spent time searching for records" relating to Andrews at the courthouse and "driving around [] in taxis" looking for evidence of Andrews's "good character and good deeds." *Id.* at 663. On their second trip, Miller and Lenoir again reviewed records from the Mobile County Courthouse. *Id.* They then interviewed Andrews's mother during a layover at the Pensacola airport. *Id.*

At the reference hearing, Miller initially testified that the first trip to Alabama included three days of investigation of Andrews's background. He changed that account after being confronted with evidence that the lawyers were, in fact, in New Orleans for most of the trip. In reality, the lawyers spent a single day in Mobile, flying back to New Orleans that same day. The dates of the trip coincided with Mardi Gras.

The second trip to Alabama also began with a stop in New Orleans. On the next day, counsel flew to Mobile to "check[] the court records," then traveled to Pensacola to interview Andrews's mother, then flew to Tampa—all in the same day. After a day in Tampa, the lawyers then spent five days in Miami. Neither New Orleans, Tampa, nor Miami have any connection whatsoever to Andrews's case.

The referee found that Miller and Lenoir's investigation was limited in part by Andrews's opposition to his family's participation in the penalty phase. *In re Andrews*, 52 P.3d at 664. Miller testified that he had concerns about introducing evidence of Andrews's incarceration history, as he was "not generally impressed with prisoners and did not want to trade 'good acts' for 'bad acts.'"**[3]** *Id.* There were no other constraints to developing witnesses or a mental health profile of Andrews. *Id.*

The referee also made findings relating to evidence the prosecution might have introduced in aggravation. She concluded that, had Andrews's counsel attempted to introduce evidence in mitigation, the prosecution could have introduced additional facts about two of Andrews's prior convictions. *Id.* at 664–65. With respect to Andrews's prior murder conviction, a taxi driver could have testified that after Andrews and Square escaped from the scene, they robbed the driver at gunpoint and Andrews fired at least two shots at the driver from thirty feet away. *Id.* at 665. As for the robbery, a police officer could have testified that Andrews held a young woman hostage at the scene, threatening to shoot her and police officers. *Id.* The referee also determined that the prosecution was likely to call its own mental health experts to rebut Andrews's. *Id.* at 670. However, the prosecutor from Andrews's trial, who had become a state court judge in the interim, "testified that if the defense had presented evidence of the Alabama prison conditions he probably would *not* have called rebuttal witnesses to give details about petitioner's Alabama crimes." *Id.* at 682 (Kennard, J., dissenting). The referee did not,

---

**[3]** Andrews's lead counsel, Lenoir, died before the referee conducted the hearing. *In re Andrews*, 52 P.3d at 663 n.7. Thus, the referee only received testimony from Miller.

however, credit this testimony. *Id.* at 665–66 (majority opinion).

**2**

After reviewing these findings, the California Supreme Court turned to Andrews's claim that Miller and Lenoir provided ineffective assistance of counsel at the penalty phase of his trial.

First, the California Supreme Court held that Andrews's counsel had not performed deficiently. *See id.* at 667–70. The court acknowledged the referee's findings that "simple persistence" would have yielded much of the mitigation evidence presented at the reference hearing and that Miller and Lenoir "could well have made a more thorough investigation than [they] did." *Id.* at 668–69 (alteration in original). But, in the court's view, Miller and Lenoir's failure to exercise that persistence was excused by Andrews's request that his family not be involved and his failure to volunteer information about the abuse he had endured. *Id.* at 668.

Having concluded that Miller and Lenoir's preliminary investigation was reasonable, the California Supreme Court then looked to the reasonableness of the strategy Miller and Lenoir apparently adopted—portraying Andrews as a "follower" and comparing Andrews's sentence to the sentences imposed in other recent murder cases. *Id.* at 669. The California Supreme Court concluded this approach was reasonable. *Id.* at 669–71. Although noting that the mitigating evidence Miller and Lenoir failed to present at the penalty phase "leaves no doubt [Andrews] endured horrifically demeaning and degrading circumstances" in Alabama, *id.* at 671, the court ventured that the evidence could have backfired because it would have required counsel

to call a series of inmates as witnesses, "including one death row inmate, with serious felony records for murder, rape, and armed robbery," *id.* at 670–71.

Second, the California Supreme Court concluded that, "[f]or the same reasons" it found Miller and Lenoir had not performed deficiently, it also found Andrews had not been prejudiced by Miller and Lenoir's performance. *Id.* at 671. The court then denied Andrews's habeas petition. *Id.* at 676.

Two justices of the California Supreme Court dissented, *id.* at 676, 684, including Justice Kennard, who authored the California Supreme Court's opinion affirming Andrews's conviction and sentence on direct appeal, *People v. Andrews*, 776 P.2d 285 (Cal. 1989). After reviewing all the evidence adduced at the reference hearing, the dissent concluded that it could not "put confidence in the verdict of a jury that decided the case without hearing the substantial mitigating evidence that competent counsel could and should have presented." *In re Andrews*, 52 P.3d at 684 (Kennard, J., dissenting) (internal quotation mark omitted).

## C

Following the California Supreme Court's denial of Andrews's state habeas petition, Andrews filed a habeas petition in federal district court. His amended petition included thirty-two claims. The district court denied relief on thirty-one of the thirty-two claims, but granted relief on Andrews's penalty-phase ineffective assistance of counsel claim. The district court also granted a certificate of appealability for one claim: whether California's lethal injection protocol violates the Eighth Amendment.

Andrews filed a timely appeal, seeking reversal of the district court's denial of his challenge to California's lethal

injection protocol in addition to several uncertified claims. The State cross-appealed the district court's grant of relief on Andrews's ineffective assistance of counsel claim.

A divided panel of this Court reversed the district court's grant of relief, dismissed Andrews's challenge to the lethal injection protocol as unripe, and otherwise denied the petition. *Andrews v. Davis*, 866 F.3d 994 (9th Cir. 2017).

We ordered the case reheard en banc. *Andrews v. Davis*, 888 F.3d 1020 (9th Cir. 2018).

## II

We review a district court's grant or denial of habeas relief *de novo*. *Sanders v. Cullen*, 873 F.3d 778, 793 (9th Cir. 2017).

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, governs our review of Andrews's petition. Under AEDPA, we look to the last reasoned state court decision—here, the California Supreme Court's decision—to address the merits of Andrews's claims. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Under AEDPA, we must defer to that state court's decision with respect to any claim adjudicated on the merits, *see* 28 U.S.C. § 2254(d), unless the adjudication of the claim involved an "unreasonable application" of clearly established federal law as determined by the Supreme Court of the United States, *id.* § 2254(d)(1).[4] A state court decision

---

[4] Deference is also not required when a state court's decision is "contrary to" clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). But, as explained below, that situation is not present here.

rests on an "unreasonable application" of federal law where a state court identifies the correct governing rule, but unreasonably applies that rule to the facts of the prisoner's case. *Williams v. Taylor*, 529 U.S. 362, 407–08 (2000).

An unreasonable application must be "'objectively unreasonable,' not merely wrong." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks omitted). It is not enough that a federal habeas court concludes "in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003) (internal quotation mark omitted). Rather, the decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Under 8 U.S.C. § 2254(d)(2), deference to a state court decision is also not required where the decision is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A state court's factual findings are "presumed to be correct," *id.* § 2254(e)(1), and the same standard of unreasonableness under § 2254(d)(1) applies under § 2254(d)(2), *see Rice v. Collins*, 546 U.S. 333, 339, 342 (2006). Unreasonable determinations of material facts can occur "where the state court[] plainly misapprehend[s] or misstate[s] the record in making [its] findings" or where the state court "has before it, yet apparently ignores, evidence that supports petitioner's claim." *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004), *cert. denied*, 543 U.S. 1038 (2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014).

*Strickland v. Washington* and its progeny constitute the clearly established federal law governing claims of ineffective assistance of counsel. *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (citing *Strickland*, 466 U.S. at 668). *Strickland* recognizes that, under the Sixth Amendment, the accused has a constitutional right to the effective assistance of counsel at the guilt and penalty phases of a capital trial. 466 U.S. at 684–87. To establish ineffective assistance under *Strickland*, a prisoner must demonstrate that: (1) counsel's "performance was deficient"; and (2) counsel's "deficient performance prejudiced the defense." *Id.* at 687. The "ultimate focus" of the *Strickland* standard is "the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696.

To establish deficient performance, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 44 U.S. at 689). With respect to prejudice, a petitioner must demonstrate that, "but for counsel's unprofessional errors," there is a "reasonable probability" that the "result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In the context of the penalty phase of a capital case, it is enough to show "a reasonable probability that at least one juror" would have recommended a sentence of life instead of death. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003). The likelihood of that result must be "substantial, not just conceivable." *Richter*, 562 U.S. at 112.

For purposes of our review, the "only question that matters" is whether the state court's decision involved an

unreasonable application of *Strickland*'s principles. *See Andrade*, 538 U.S. at 71. In any ineffectiveness case, *Strickland* sets a high bar for relief. *Richter*, 562 U.S. at 105. And, under AEDPA's deferential standard, that bar is doubly difficult to clear. *Id.*[5]

With this framework in mind, we turn to Andrews's claim that he received ineffective assistance of counsel at the penalty phase of his trial.

### III

With regard to *Strickland*'s performance prong, the California Supreme Court unreasonably applied clearly established federal law in concluding Andrews received constitutionally adequate counsel at the penalty phase of his trial.

With their client's life in the balance, Miller and Lenoir performed almost no investigation at the penalty phase. Compounding that error, they introduced almost no mitigating evidence during the penalty phase, despite the ready availability of "substantial and compelling" evidence. *In re Andrews*, 52 P.3d at 680 (Kennard, J., dissenting).

The Supreme Court[6] has recognized that reasonable assistance will take a variety of forms. *See Strickland*, 466 U.S. at 688–89. Even so, it has never held that counsel may forgo a thorough background investigation and wholly fail to present evidence in mitigation where readily available,

---

[5] Though our dissenting colleague repeatedly accuses us of engaging in a *de novo* review of the California Supreme Court's decision, we understand the appropriate standard of review and apply it here.

[6] All references to "the Supreme Court" throughout this opinion are to the United States Supreme Court, not the California Supreme Court.

compelling, and non-cumulative mitigating evidence exists. Reading *Strickland* and its progeny to support such a conclusion, as the California Supreme Court did here, was objectively unreasonable.

## A

Clearly established federal law required Miller and Lenoir to undertake a "reasonable investigation[]" in preparation for the penalty phase. *Id.* at 691. While the Court has made clear that the nature and scope of a given investigation will vary based on the circumstances of the case, *id.* at 688–89, the "proper measure" of the adequacy of an attorney's investigation is "reasonableness under prevailing professional norms," *id.* at 688. "American Bar Association [(ABA)] standards and the like" are evidence of those norms and "guides to determining what is reasonable[.]" *Id.*; *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005).

According to the ABA standards in effect at the time of Andrews's trial, defense counsel had a duty to conduct an investigation designed to "explore *all* avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." Standards for Criminal Justice § 4-4.1 (Am. Bar Ass'n 1980) (emphasis added). These standards recognize that "[i]nvestigation is essential" to fulfilling counsel's "substantial and important" duty to raise mitigating factors at sentencing. *Id.*; *see also Wiggins*, 539 U.S. at 524–25 (considering ABA standards).

No fair-minded jurist would conclude that Miller and Lenoir conducted the requisite "thorough investigation" of Andrews's background at the penalty phase. *Williams*, 529 U.S. at 396. Indeed, Andrews's counsel conducted

"virtually no penalty phase investigation." *In re Andrews*, 52 P.3d at 676 (Kennard, J., dissenting).

What little investigation did occur consisted of just three elements: (1) reviewing files at the courthouse in Mobile; (2) speaking with Andrews's mother during a layover in an airport; and (3) driving around Mobile. *See id.* at 663 (majority opinion). Although Miller and Lenoir hired investigators to work on the guilt phase, neither investigator did any penalty-phase work. *Id.* Nor were they asked to. Miller and Lenoir failed to conduct "standard legal research" concerning the Alabama institutions where Andrews was confined as a child. *Id.* at 662. And Miller and Lenoir failed to take the "[r]outine" step of having Andrews examined by a psychologist, psychiatrist, or any other mental health professional. *Id.* at 662–63 (alteration in original). As noted above, the referee found that Miller and Lenoir failed to exercise "simple persistence" and failed to use "standard investigative techniques" in preparing for the penalty phase. *Id.* at 662 (internal quotation marks omitted).

Each of these steps should have been a standard component of counsel's penalty-phase investigation. And even the most basic of investigations would have uncovered evidence of the abuse Andrews suffered. *See Williams*, 529 U.S. at 395–96. No fair-minded jurist would conclude that Miller and Lenoir's penalty-phase investigation—one that lacked "simple persistence," "standard investigative techniques," "standard legal research," and the "[r]outine" appointment of expert assistance, *In re Andrews*, 52 P.3d at 662 (alteration in original) (internal quotation marks omitted)—was reasonable. *See Strickland*, 466 U.S. at 690–92; *see also Williams*, 529 U.S. at 396; *Wiggins*, 539 U.S. at 524; *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam); *Rompilla*, 545 U.S. at 381.

The California Supreme Court unreasonably applied the Supreme Court's decision in *Williams* to excuse Miller and Lenoir's failure to undertake a reasonable background investigation. *See In re Andrews*, 52 P.3d at 674–75. In *Williams*, counsel began preparing for sentencing one week before trial. 529 U.S. at 395. Due to counsel's misunderstanding of state law concerning access to juvenile records, counsel failed to fully investigate his client's early life and background. *Id.* Had counsel performed the requisite investigation, it would have disclosed a wealth of potentially mitigating evidence—including evidence of Williams's "nightmarish" childhood, one "filled with abuse and privation." *Id.* at 395, 398. Counsel also failed to investigate other avenues for mitigation, such as evidence of Williams's intellectual disability and his good behavior while incarcerated. *Id.* at 396. The Supreme Court held that the failure to uncover this information "clearly demonstrate[d] that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." *Id.* Therefore, the Supreme Court concluded, the state court was unreasonable to conclude that Williams's counsel performed adequately under *Strickland*. *Id.* 397–98.

In terms of Miller and Lenoir's investigation, the most substantial distinction between the facts of this case and those of *Williams* is the *reason* counsel failed to uncover information about their clients' backgrounds. In *Williams*, counsel misunderstood the law. *Id.* at 395. Here, no legal misunderstanding stood in the way; Miller and Lenoir simply failed to exercise "simple persistence," failed to use "standard investigatory techniques," and failed to obtain the "[r]outine" appointment of mental health experts. *In re Andrews*, 52 P.3d at 662 (alteration in original). Any fair-minded jurist would agree that counsel's failures in *Williams*

and here *both* reflect a failure to adhere to reasonable professional standards.  No reasonable jurist would conclude that one is indicative of deficient performance and the other is not.

## B

Rather than dispute the referee's findings, the California Supreme Court instead unreasonably and remarkably excused Miller and Lenoir's failure to perform an adequate penalty-phase investigation.  Despite expressly acknowledging that Miller and Lenoir could have performed a more thorough investigation at the penalty phase, *id.* at 669, the court nonetheless determined that Miller and Lenoir's decision to curtail their investigation was reasonable because:  (1) Andrews did not want his family involved; (2) Andrews did not tell his counsel about the abuse he suffered in the past; and (3) the Mt. Meigs evidence would have required testimony from inmates, *see id.* at 668–69.

Each of these justifications turns on an *unreasonable* determination of the record before the California Supreme Court.  *See* 28 U.S.C. § 2254(d)(2).  These factual determinations are not just incorrect; they are directly contradicted by other evidence in the record.  *See Taylor*, 366 F.3d at 1001.

### (1) Andrews's refusal to involve his family.

The California Supreme Court unreasonably excused counsel's failure to undertake a thorough penalty-phase investigation because Andrews asked that his family not be involved.  *See In re Andrews*, 52 P.3d at 668.

This conclusion by the court is unreasonable for a simple reason: As the referee concluded, counsel *did not need* Andrews's family to uncover evidence of the abuse he suffered in Alabama. *See id.* at 663. As the referee found, evidence of the conditions at Mt. Meigs either "could have been developed by obtaining prison records and contacting inmates referenced in those records," or by conducting "*standard legal research of public records* relating to lawsuits involving th[e] institution." *Id.* at 662 (emphasis added). Other than not involving his family, Andrews imposed no limitation on counsel's investigation, and the referee found no obstacles to obtaining witnesses who were not members of Andrews's family. *Id.*; *see id.* at 681 (Kennard, J., dissenting).

Moreover, notwithstanding Andrews's request, counsel interviewed Andrews's mother. *Id.* at 663 (majority opinion). She knew about Andrews's history at Mt. Meigs and could have provided insight about the effect it had on him. *Id.* But trial counsel failed to ask any questions that would have elicited this information. *Id.*

### (2) Andrews's failure to tell counsel about his past.

The California Supreme Court also unreasonably excused Miller and Lenoir's limited penalty-phase investigation based on Andrews's failure to affirmatively volunteer information. *See In re Andrews*, 52 P.3d at 668.

Andrews never told his attorneys about his past—nor specifically about his time at Mt. Meigs. But nothing suggests that counsel ever asked Andrews basic questions designed to elicit their client's life history. *See id.* at 681 (Kennard, J., dissenting) ("[Andrews] did not withhold that information. His attorneys never raised the subject."). Regardless, as the referee explicitly found: "[A]ll of the

information that was presented [at the reference hearing] could have been developed through outside sources in the absence of any cooperation from [Andrews]." *Id.* at 663 (majority opinion) (alteration added) (internal quotation mark omitted). The California Supreme Court did not dispute this finding; it simply ignored it. *See id.* at 668.

The California Supreme Court's reliance on *Strickland* to excuse Miller and Lenoir's failure to investigate their client's life history, *see id.*, was itself unreasonable. *Strickland* recognizes that the reasonableness of counsel's investigation can be "influenced by the defendant's own statements or actions." 466 U.S. at 691. That is, counsel can reasonably make judgments based on what a defendant *actually says*. *Id.* (defining reasonableness of investigation based on "what the defendant has said" and what "a defendant has given counsel reason to believe"). But neither *Strickland* nor its progeny suggest that a client's failure to affirmatively volunteer information about his past relieves counsel of the independent duty to investigate it—*especially* when the record suggests counsel never bothered to ask. *See In re Andrews*, 52 P.3d at 681 (Kennard, J., dissenting). In fact, later Supreme Court decisions have explained that the opposite is true. A client may be "fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation." *Porter*, 558 U.S. at 40.

To read *Strickland* as requiring a defendant to, first, know what mitigating evidence is, and, second, affirmatively volunteer theories of mitigation, is objectively unreasonable. Indeed, under clearly established federal law at the time, the obligation to develop legal strategy was, and is, the responsibility of counsel. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). The California Supreme Court's apparent

assignment of that responsibility to Andrews was objectively unreasonable.

### (3) Reliance on the testimony of inmates.

The California Supreme Court also unreasonably concluded that counsel were justified in curtailing their investigation into Andrews's background because evidence of Andrews's treatment in the Alabama correctional system would have required the use of testimony from inmates. *See In re Andrews*, 52 P.3d. at 668–69.

Again, this conclusion was directly contradicted by the record. At the reference hearing, "a federal district judge, a priest, a college dean, a clinical psychologist, a longtime prison doctor, and the regional director for the Florida Bureau of Detention, all . . . gave powerfully effective testimony about the shocking conditions" Andrews endured at Mt. Meigs and other Alabama institutions. *Id.* at 681 (Kennard, J., dissenting). The California Supreme Court's decision to ignore the compelling testimony these witnesses could have provided was objectively unreasonable. *See* 28 U.S.C. § 2254(d)(2).

Taken as a whole, the California Supreme Court's reliance on a series of unsupported factual conclusions to excuse counsel's unreasonably limited investigation amounts to the type of "'*post hoc* rationalization' for counsel's decisionmaking" the Supreme Court has cautioned against. *Richter*, 562 U.S. at 109 (quoting *Wiggins*, 539 U.S. at 526–27). Each of the California Supreme Court's factual determinations, individually and collectively, further "highlights the unreasonableness of the state court's decision." *Wiggins*, 539 U.S. at 528.

## C

Having excused Miller and Lenoir's investigation, the California Supreme Court determined that Miller and Lenoir *chose* their penalty-phase strategy "*[i]nstead of* a lengthy presentation of a broad range of witnesses" documenting Andrews's background. *In re Andrews*, 52 P.3d at 669 (emphasis added). But choosing a strategy implies the weighing of competing approaches. Miller and Lenoir simply did not *know* about Andrews's background, so they could not have intelligently chosen one strategy over another. *See id.* at 676–77 (Kennard, J., dissenting). Here, counsel failed at the outset to investigate thoroughly, rendering later penalty-phase decisions a product of "inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 526. Only by unreasonably applying *Strickland* and its progeny did the California Supreme Court conclude counsel's performance was adequate.

In *Strickland*, the Supreme Court held it was reasonable for counsel to fail to introduce evidence that would "barely have altered the sentencing profile" and would have opened the door to potentially damaging aggravating evidence. 466 U.S. at 700. So too in *Darden v. Wainwright*, counsel's decision to pursue an alternate strategy at sentencing was reasonable because evidence regarding defendant's background could have opened the door to his prior convictions, which had not been admitted in evidence. *See* 477 U.S. 168, 186 (1986).

That was not the situation confronted by Andrews's counsel. First, the evidence of Andrews's "nightmarish childhood" would have altered Andrews's sentencing profile substantially. As the Supreme Court has recognized, omission of this type of critical mitigating evidence can prejudice a capital defendant. *See Williams*, 529 U.S. at 395.

Second, the *jury already knew* about Andrews's prior crimes. When a defendant's prior criminal history is already known to the jury, counsel performs unreasonably in not presenting a range of persuasive mitigating evidence about the defendant's background that "no other source had opened up." *See Rompilla*, 545 U.S. at 390 (finding counsel deficient when counsel knew the prosecution would introduce at the penalty phase defendant's "significant history" of prior violent crimes, but counsel nevertheless failed to review the readily available prior conviction file).[7] No reasonable jurist would conclude otherwise.[8]

The California Supreme Court relied on the Supreme Court's decision in *Burger v. Kemp*, 483 U.S. 776 (1987), to conclude that counsel's penalty-phase strategy—portraying Andrews as a "follower" and arguing that others, including Andrews's co-defendant Sanders, had received lighter

---

[7] Although the Supreme Court decided *Rompilla* after the California Supreme Court denied Andrews's habeas petition, *Rompilla* is still relevant to assessing whether the court unreasonably applied *Strickland* for purposes of AEDPA deference. *See Wiggins*, 539 U.S. at 522 (approving reliance on Supreme Court opinions issued after state court's decisions where the merits are governed by *Strickland*). *Rompilla* is particularly instructive in light of its application of AEDPA deference to the deficient-performance analysis. *See* 545 U.S. at 380.

[8] The fact that the jury did not hear details of Andrews's prior offenses has no bearing on the reasonableness of counsel's decision to forgo a case in mitigation. Had counsel's choice "foreclosed the introduction" of this evidence, as the California Supreme Court found, *In re Andrews*, 52 P.3d at 669, that of course could have affected our assessment of counsel's strategy. But the California Supreme Court made clear that the evidence of Andrews's prior crimes would have been admissible to rebut the defense case which *was* presented. *Id.* at 666. The happenstance that the aggravating evidence was not presented is therefore not attributable to counsel's strategy and, because we assess a lawyer's choices "from counsel's perspective at the time," *Strickland*, 466 U.S. at 689, it does not factor into our deficiency analysis.

sentences—was a reasonable strategy. *In re Andrews*, 52 P.3d at 669.

But "[t]his case is not at all like *Burger*." *Id.* at 682 (Kennard, J. dissenting). In *Burger*, the penalty-phase strategy that counsel ultimately adopted—attempting to minimize culpability by portraying his client as a follower— was reasonable because it was supported by the record before the jury. *See* 483 U.S. at 779 (noting evidence at trial showed Burger's co-defendant was primarily responsible for the crime).

Here, portraying Andrews as a follower was "a disastrous strategy, one no reasonably competent attorney would have used." *In re Andrews*, 52 P.3d at 682 (Kennard, J., dissenting). With regard to his crimes of conviction, "the only evidence before the jury was that [Andrews] was the instigator rather than a follower." *Id.* Moreover, because the evidence showed Andrews was the instigator and "Sanders was the follower," the "jurors were not likely to be troubled by Sanders's lighter sentence." *Id.* It is objectively unreasonable to conclude, as the California Supreme Court did, that a penalty-phase strategy is reasonable when it is directly contradicted by the evidence in the record.

Further, in *Burger*, defense counsel performed a reasonable initial mitigation investigation, speaking to a family member, a friend, and a psychologist to learn about his client's background. *See* 483 U.S. at 790–91. By contrast, counsel's background investigation here only consisted of speaking to Andrews's mother, pulling court files, and "driving around" Mobile looking for mitigating evidence. *In re Andrews*, 52 P.3d at 663. Counsel failed to speak to any other friends or family, failed to conduct "standard legal research," and failed to take the "[r]outine"

step of having Andrews evaluated by a mental health
professional. *Id.* at 662 (alteration in original).

The California Supreme Court observed that the
"defendant in *Burger* endured a worse childhood" than
Andrews. *Id.* at 673. But this conclusion, too, is
unreasonable. While the defendant in *Burger* had an
"exceptionally unhappy and unstable childhood," 483 U.S.
at 789, nothing suggests Burger endured anything
comparable to—let alone *worse than*—the violent beatings
and degrading physical abuse Andrews suffered as a child at
Mt. Meigs. Thus, contrary to the California Supreme
Court's conclusion, *Burger* does not present "comparable
facts" to Andrews's case. *In re Andrews*, 52 P.3d. at 673.

The California Supreme Court also unreasonably applied
*Bell v. Cone*, 535 U.S. 685 (2002), to support its conclusion
that Andrews's counsel performed adequately. Though the
court correctly noted that counsel in *Cone* "presented no
penalty phase evidence and waived closing argument," *In re
Andrews*, 52 P.3d at 673 (citing *Cone*, 535 U.S. at 699–702),
the court ignored the fact that, in *Cone*, defense counsel
*actually introduced* substantial mitigating evidence at the
guilt phase of the trial, *see Cone*, 535 U.S. at 699. "Because
the defense's theory at the guilt phase was not guilty by
reason of insanity, [Cone's] counsel was able to put before
the jury *extensive testimony* about what he believed to be the
most compelling mitigating evidence in the case . . . ." *Id.*
(emphasis added). This included testimony from Cone's
mother about her son and the changes Cone underwent after
serving in the Vietnam War, among other humanizing
testimony. *Id.* at 690.

Thus, the question in *Cone* was whether counsel was
deficient for failing to *re-call* those witnesses at the penalty
phase. *Id.* at 699–700. Because Cone's jury heard this

mitigating evidence at the guilt phase and was instructed to consider it at sentencing, the Supreme Court determined counsel's decision not to reintroduce the mitigating evidence was reasonable. *Id.* But *Cone* does not support the blanket proposition, as the California Supreme Court apparently concluded, that counsel can altogether forgo the introduction of substantial mitigating evidence where such evidence in fact exists. *See In re Andrews*, 52 P.3d at 668, 673. That interpretation of *Cone* is objectively unreasonable.

The California Supreme Court also cited *Cone* for the proposition that counsel may reasonably decide not to present background evidence when testimony about a defendant's "normal youth" might, in the eyes of the jury, be perceived negatively and cut the other way. *See id.* at 673 (referring to counsel's remark that Andrews's childhood neighborhood was "comparable to his own"). However, all reasonable jurists would agree that the years Andrews spent at Mt. Meigs were the *antithesis* of a "normal youth." The California Supreme Court's reliance on *Cone*, while simultaneously ignoring the fact that Andrews's youth included his experience at Mt. Meigs, was objectively unreasonable.

If any doubt remained about the unreasonableness of the California Supreme Court's application of *Strickland*'s deficiency prong, the court's repeated, approving reliance on the Fourth Circuit's decision in *Wiggins*—a decision the Supreme Court subsequently reversed—puts those doubts to rest. *See id.* at 668, 669, 671, 676 (citing *Wiggins v.*

*Corcoran*, 288 F.3d 629 (4th Cir. 2002), *rev'd sub nom.*
*Wiggins v. Smith*, 539 U.S. 510 (2003)).[9]

In *Wiggins*, counsel's investigation was limited to three
sources:  (1) psychological testing; (2) a presentence report;
(3) and records from the Baltimore City Department of
Social Services.   539 U.S. at 523.   Although Wiggins's
attorneys had some cursory understanding of their client's
background, their investigation failed to fully uncover
evidence of Wiggins's "harsh childhood," including
physical and sexual abuse as a child, and "sub-average
mental capacity."  *Wiggins v. Corcoran*, 288 F.3d at 635,
640.  Nevertheless, applying AEDPA deference, the Fourth
Circuit determined the Maryland state court's application of
*Strickland*'s  deficiency  prong  was  not  unreasonable
notwithstanding counsel's failure to uncover and present
reasonably available and compelling mitigating evidence.
*See id.* at 639–43.  The Supreme Court reversed.  *Wiggins*,
539 U.S. at 519.

Just as it had in *Williams*, the Court in *Wiggins*
recognized that counsel "abandon[ed] their investigation at
an unreasonable juncture," thereby failing to conduct the
requisite, thorough background investigation *Strickland*
generally requires.  *Id.* at 527–28.  That failure, in turn, made
it "impossible" to provide a "fully informed decision with
respect to sentencing strategy."  *Id.*  Even under AEDPA's
deferential standard, the Supreme Court held that the
Maryland state court had unreasonably applied *Strickland* by

---

[9] Although the Supreme Court's decision in *Wiggins* was issued
after the California Supreme Court decided Andrews's case, the
Supreme Court "made no new law" in resolving Wiggins's federal
habeas petition.  *Wiggins*, 539 U.S. at 522 (describing similar situation
in *Williams*).  *Wiggins* is thus "illustrative of the proper application" of
the *Strickland* standard in a federal habeas case under AEDPA—an
application the Fourth Circuit performed improperly.  *Id.*

"deferring to counsel's decision not to pursue a mitigation case despite their unreasonable investigation." *Id.* at 534.

That the California Supreme Court saw the Fourth Circuit's decision—one subsequently reversed by the Supreme Court for endorsing an improper application of AEDPA to a *Strickland* claim—as providing substantial support for its analysis should settle any doubt about the reasonableness of the California Supreme Court's own application of the *Strickland* standard. Like the Maryland state court and the Fourth Circuit, the California Supreme Court unreasonably applied *Strickland* to excuse counsel's failures at the penalty phase.

The duty to conduct a thorough investigation of a capital defendant's background is imposed on counsel to prevent this very circumstance: a man sentenced to death without consideration of non-cumulative, readily available evidence of compelling mitigating value. Here, the only reasonable interpretation of Supreme Court precedent and the facts of this case lead to the following conclusions: (1) that Miller and Lenoir failed in their duty to undertake a reasonable investigation at the penalty phase of Andrews's trial; (2) that Miller and Lenoir's choices cannot be rationalized as "strategic" or "tactical;" and (3) that any reasonably competent attorney would have discovered and introduced the substantial and compelling mitigating evidence that existed. No fair-minded jurist would conclude otherwise.

## IV

Turning to *Strickland*'s prejudice prong, the California Supreme Court concluded that Andrews suffered no prejudice from the omission of the substantial and compelling mitigating evidence that Miller and Lenoir could have introduced, but did not. That conclusion, too, turns on

an objectively unreasonable application of *Strickland* and its progeny.

In fact, the California Supreme Court hardly engaged in the reweighing of evidence that *Strickland*'s prejudice analysis requires. The totality of the California Supreme Court's prejudice analysis consisted of the following assertion:

> For the same reasons [Andrews's counsel were not deficient], it is not "reasonabl[y] proba[ble]" petitioner was prejudiced by counsel's rejection of a defense premised on evidence of petitioner's upbringing, the Alabama prison conditions he experienced, and his mental health in light of the circumstances of the crimes, given the ambiguous nature of some mitigating evidence and the substantial potential for damaging rebuttal.

*In re Andrews*, 52 P.3d at 671 (alterations in original) (citation omitted). With the exception of a later aside about the jury's apparent unwillingness to entertain a life sentence, *id.* at 675–76,[10] the court said nothing more about prejudice.

*Strickland*'s two prongs serve separate purposes. The deficiency analysis looks to counsel's adherence to reasonable professional standards, *see* 466 U.S. at 689–91,

---

[10] The California Supreme Court noted: "[T]he record here contains no indication the jury was inclined to sentence petitioner to life imprisonment and might have been persuaded by additional or alternate mitigation evidence." *In re Andrews*, 52 P.3d at 675–76. This approach, however, is flatly contradicted by *Strickland* itself, which insists that the prejudice determination should be unaffected by "evidence about the [jury's] actual process of decision." 466 U.S. at 695.

while prejudice looks to the weight of the available evidence and its effect on the case, *see id.* at 693–95.  Though the deficiency analysis may shed light on the prejudice analysis, it is improper to simply conflate the two, as the California Supreme Court largely did here.  *See Sears v. Upton*, 561 U.S. 945, 954 n.10, 955 (2010) (per curiam).  Our dissenting colleague's insistence that the California Supreme Court "rigorously" and "carefully" applied *Strickland*'s prejudice analysis is especially odd given that the court dispensed with its analysis in two sentences.  *See* Dissent at 60, 76.

Nevertheless, we assume the California Supreme Court's failure to actually engage in the prejudice inquiry, alone, is insufficient to justify granting the writ.  AEDPA demands that "state-court decisions be given the benefit of the doubt," *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks omitted), and a state court's decision need not cite or even be aware of controlling Supreme Court precedent, so long as it does not contravene those precedents, *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

Even so, giving the California Supreme Court's decision all the deference it is due along with every benefit of the doubt, only an unreasonable application of *Strickland*'s principles could lead to the conclusion that Andrews was not prejudiced by counsel's deficient representation at the penalty phase.

The jurors who sentenced Andrews to death did so "knowing hardly anything about him." *Porter*, 558 U.S. at 33.  Had the jury heard that Andrews—at an "extremely vulnerable and sensitive age"—was subjected to brutal, inhumane, and degrading abuse by his state custodians at a segregated "penal colony" for African American children in Alabama in the 1960s, *In re Andrews*, 52 P.3d at 662, 684,

there is a reasonable probability that at least one juror would have been swayed to exercise mercy and spare Andrews's life, *see Wiggins*, 539 U.S. at 537.

Without having heard this substantial and compelling mitigating evidence, the jury could not fairly gauge Andrews's moral culpability at sentencing. *See Porter*, 558 U.S. at 41. No fair-minded jurist would disagree.

## A

Under clearly established federal law, consideration of the defendant's life history is a "constitutionally indispensable part of the process of inflicting the penalty of death." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (internal quotation marks omitted).

Though mitigating life history evidence does not excuse heinous crimes, it places a defendant's crimes in context, allowing jurors to impose a sentence reflecting a "reasoned *moral* response to the defendant's background, character, and crime." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation marks omitted), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).

Evidence of abuse inflicted as a child is especially mitigating, and its omission is thus particularly prejudicial. "[Y]outh is more than a chronological fact. It is a time and condition of life" that indelibly shapes a person. *Eddings*, 455 U.S. at 115. A jury's consideration of abuse and disadvantage suffered during this formative time is especially critical, given our society's "long held" belief that "defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Boyde v. California*,

494 U.S. 370, 382 (1990) (emphasis omitted) (internal quotation marks omitted).

At sentencing, Miller and Lenoir presented almost no evidence in mitigation. "The only evidence before the jury" was that Andrews "had killed three people" and that he "had four prior felony convictions." *In re Andrews*, 52 P.3d at 684 (Kennard, J., dissenting). The jury knew nothing about Andrews's background—not the "inhumane conditions" he endured as a child at Mt. Meigs; not the "abysmal" conditions in Alabama's correctional system; not the views of mental health experts, that these degrading experiences in state institutions rendered Andrews's later criminal behavior understandable and predictable. *Id.*

Indeed, this type of life history evidence—a background of severe abuse, neglect, and disadvantage—is important to a sentencer's accurate determination of the defendant's moral culpability. *See Wiggins*, 539 U.S. at 534–35; *Porter*, 558 U.S. at 41. Under clearly established law at the time, the degrading abuse Andrews suffered at Mt. Meigs is precisely the sort of "troubled history" the Supreme Court has recognized as relevant in aiding the jury's evaluation of the defendant. *Wiggins*, 539 U.S. at 535 (citing *Penry*, 492 U.S. at 319).

The California Supreme Court—to the extent it engaged with any governing Supreme Court precedent in conducting its prejudice analysis—did so in an objectively unreasonable way. For example, in *Williams*, the Supreme Court held there was a reasonable probability of a different result at sentencing if counsel had presented evidence of defendant's "nightmarish childhood" or his intellectual disability. *See* 529 U.S. at 395, 398. But the California Supreme Court's conclusion that *Williams* was "plainly distinguishable" from Andrews's case turned on at least two objectively

unreasonable analytical flaws.  *In re Andrews*, 52 P.3d at 674.

First, the California Supreme Court failed to acknowledge the substantial aggravating evidence that existed in *Williams*.  The court suggested the aggravating facts of Andrews's "brutal triple murder" paled in comparison to *Williams*, where "Williams turned himself in, alert[ed] police to a crime they otherwise would never have discovered, express[ed] remorse for his actions, and cooperat[ed] with the police after that."  *Id.* at 675 (alterations in original) (quoting *Williams*, 529 U.S. at 398).

But distinguishing the two cases—by comparing the *aggravating* facts of Andrews's case to *mitigating* facts in *Williams*—is objectively unreasonable.  Indeed, comparison of the actual aggravating facts in *Williams* shows that both cases involved severe aggravation.  In *Williams*, the jury heard evidence that, in the months after the capital murder, "Williams savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw."  529 U.S. at 418 (Rehnquist, C.J., concurring in part and dissenting in part) (internal quotation marks omitted).[11]  One of Williams's elderly victims was left in a vegetative state. *Id.* at 368 (majority opinion) (internal quotation marks omitted).   And two expert witnesses testified for the prosecution at sentencing "that there was a 'high probability' that Williams would pose a serious continuing threat to society."  *Id.* at 368–69.  Although the aggravating facts in this case are undeniably severe, they are largely similar to

---

[11] We cite to Chief Justice Rehnquist's concurring opinion in *Williams* for its vivid recitation of facts—not, as the dissent complains, *see* Dissent at 88 n.9, for conclusions of law.

those in *Williams*, not "plainly distinguishable," as the California Supreme Court unreasonably concluded. *In re Andrews*, 52 P.3d at 674.

The California Supreme Court also unreasonably compared the mitigating facts of *Williams* to Andrews's case. According to the court, Williams had an "extremely harsh family life, qualitatively worse than [Andrews's]" family life. *Id.* The court was correct that Williams' *family life* was far more abusive than Andrews's was. However, the court again ignored that Andrews's *childhood*—in particular, the years he spent at Mt. Meigs—was marked by "inhumane" treatment and abuse, at least equal in magnitude to that suffered by Williams.[12]  *Id.* at 684 (Kennard, J., dissenting). Additionally, the court ignored the fact that, unlike in this case, Williams's counsel *actually presented* mitigating evidence, including testimony from Williams's mother, two neighbors, and a psychiatrist. *Williams*, 529 U.S. at 369.

Under *Williams*, the California Supreme Court's prejudice analysis was unreasonable.  Here, the total evidence in aggravation—that which was admitted and that which may have come in as rebuttal evidence concerning Andrews's prior violent crimes—is significant, just as in *Williams*.  And, as in *Williams*, the undiscovered and unadmitted mitigating evidence in Andrews's case includes severe and sustained physical, sexual, and psychological abuse during childhood—precisely the type of evidence the

---

[12] The dissent emphasizes that Williams's early childhood was more difficult than Andrews's, Dissent at 86—a point we acknowledge. That concession, however, does not alter the fact that both Williams and Andrews endured substantial abuse as *children*. It is that fact—abuse during the "formative years of childhood and adolescence," *Eddings*, 455 U.S. at 115–16—that matters for mitigation purposes, not the precise age when the abuse occurred.

Supreme Court has recognized is essential to a jury's informed appraisal of moral culpability at sentencing. *See Williams*, 529 U.S. at 395–98; *see also id.* at 415–16 (O'Connor, J., concurring).

Although decided after the California Supreme Court rendered its decision in *Andrews*, the Supreme Court's decision in *Porter* further demonstrates the unreasonableness of the California Supreme Court's conclusion.[13]   There, due to counsel's failure to adequately investigate Porter's background, the jury that sentenced him to death never knew that he had been abused as a child or that he was a decorated Korean War veteran suffering from post-traumatic stress disorder. *See Porter*, 558 U.S. at 40–44.   Even under AEDPA deference, the Supreme Court concluded that the state court's determination—that Porter had not been prejudiced at sentencing by the omission of this key life-history evidence—was unreasonable. *See id.* at 42. The Supreme Court held that, without considering critical mitigating evidence of the defendant's background, the sentencer was unable to accurately gauge the defendant's moral culpability. *Id.* at 41, 44.   Habeas relief was thus warranted because confidence in the sentence had been undermined. *Id.* at 44; *see also Rompilla*, 545 U.S. at 393.

As in *Williams*, the Supreme Court in *Porter* affirmed that a strong case in aggravation does not preclude a finding that a state court was unreasonable in denying habeas relief. Porter stood convicted of two murders and faced

---

[13] *Porter*, like *Rompilla*, was decided after the California Supreme Court denied Andrews's habeas petition.   But for the reasons described above, *see supra* note 7, the decision is nonetheless instructive, especially in light of *Porter*'s application of AEDPA deference to the prejudice question.   558 U.S. at 41.

considerable evidence of premeditation, but the Supreme Court nonetheless held the state court's application of *Strickland* was objectively unreasonable.  *Porter*, 558 U.S. at 31.**[14]**

Thus, in *Porter* and in *Williams*, there was simply "too much mitigating evidence that was not presented to now be ignored."  *Id.* at 44 (internal quotation marks omitted).  The same is true here.

The California Supreme Court's conclusion to the contrary—that Andrews was not prejudiced by the omission of substantial and compelling mitigation evidence at sentencing—was objectively unreasonable.

## B

Had Miller and Lenoir performed competently, the evidence counsel could have presented to the jury in mitigation—particularly the evidence of Andrews's abusive and degrading treatment at Mt. Meigs—was "substantial and compelling."  *In re Andrews*, 52 P.3d at 680 (Kennard, J., dissenting).

Any reasonably competent attorney would have presented the Mt. Meigs evidence to the jury.  Mt. Meigs was a "*slave camp* for children."  *Id.* at 677 (emphasis added) (internal quotation marks omitted).  There, at an "extremely vulnerable and sensitive age," Andrews was subjected to "appalling" treatment, including "beatings, brutality, inadequate conditions and sexual predators."  *Id.* at 660–62 (majority opinion).  As the California Supreme Court

---

**[14]** The dissent repeatedly attempts to paint the crimes at issue in *Porter* as crimes of passion.  Dissent at 89.  In doing so, it overlooks the jury's finding that Porter's two murders were "committed in a cold, calculated, and premeditated manner."  558 U.S. at 32.

acknowledged, all the available evidence leaves "no doubt" that, *as a child*, Andrews "endured horrifically demeaning and degrading circumstances." *Id.* at 670.

Other mitigating evidence, though it did not rise to the level of the Mt. Meigs evidence, nonetheless offered additional mitigating value. Andrews's later conditions of confinement were "abysmal," and witnesses testified that Andrews was "personally subjected to sexual assaults" in these institutions. *Id.* at 661 (internal quotation marks omitted). Mental health experts could have provided testimony explaining the relationship between the degrading abuse suffered by Andrews in the state institutions and the crimes he ultimately committed. *Id.* at 661–62. And evidence of Andrews's family background and the poor, segregated circumstances of his youth could have helped jurors understand the factors that might have contributed to Andrews's institutionalization at a young age. *Id.* at 660.[15]

*Every* jurist to review the facts of this case has recognized the extraordinary nature of the mitigating evidence that Andrews could have presented. The referee described the mitigation evidence as "compelling." *Id.* at 662. The California Supreme Court majority described the conditions Andrews was subjected to in Alabama as "horrifically demeaning and degrading." *Id.* at 670. The two dissenting justices described the mitigating evidence as "substantial and compelling." *Id.* at 680 (Kennard, J., dissenting). And the federal district court likewise observed that the evidence of "the horrendous conditions at Mt. Meigs, the abysmal conditions in the Alabama prisons, and the violence and sexual privations inflicted upon" Andrews

---

[15] Contrary to the dissent's suggestion, *see* Dissent at 81 n.6, we need not and do not rely on Andrews's argument that the jury would have viewed his behavior in prison as a mitigating factor.

was "compelling." *Andrews v. Wong*, No. 02-CV-8969-R, slip. op. at 31 (C.D. Cal. July 27, 2009) (order granting in part petition for writ of habeas corpus). We agree, and we hold that the California Supreme Court was "unreasonable to discount to irrelevance" mitigating evidence of the kind present here. *Porter*, 558 U.S. at 43.

Contrary to the state court's reasoning, *see In re Andrews*, 52 P.3d at 670–71, with which the dissent is in apparent agreement, *see* Dissent at 77–82, concerns about the possible double-edged nature of some of the mitigating evidence or about possible rebuttal evidence do not diminish the significance of the available evidence. As described above, counsel could have presented the most substantial mitigating evidence—the Mt. Meigs evidence—without the testimony of inmates and without going into detail about Andrews's incarceration history, thus avoiding any concerns about its "double-edged" nature. Additionally, aggravating evidence about the specific details of Andrews's past crimes was of limited concern because the jury already knew, from Andrews's heinous crimes of conviction and from the stipulated prior convictions, that Andrews was antisocial and "had become desensitized and inured to violence and disrespect for the law." *Id.* at 671. The aggravating factors in this case are, undoubtedly, substantial; no person considering Andrews's crimes of conviction would conclude otherwise. The California Supreme Court accurately observed that the "crimes evinced a callous disregard for human life." *Id.* But again, that is *all* the jurors knew about Andrews. *See Porter*, 558 U.S. at 33. His counsel presented next to nothing to counter the prosecution's portrayal of their client. Counsel called no witnesses and offered no statements from family or friends. In short, counsel offered no reason for the jury to exercise mercy.

Moreover, this is decidedly not a case where the new mitigating evidence "would barely have altered the sentencing profile," *Strickland*, 466 U.S. at 700, or where the new evidence "largely duplicated the mitigation evidence" that had already been admitted, *Pinholster*, 563 U.S. at 200. Here, nothing was done in mitigation—despite the existence of a substantial and compelling mitigating case. *Strickland* recognizes that some errors by counsel will have "pervasive effect[,] . . . altering the entire evidentiary picture." 466 U.S. at 695–96. Counsel's errors had such a pervasive effect here, skewing the evidence at the penalty phase and depriving the jury that sentenced Andrews to death from hearing critical mitigating evidence. *See id.* at 696. Our conclusion—that there is a reasonable probability that at least one juror would have been swayed by this mitigating evidence, notwithstanding possible rebuttal evidence—does not overstep or neglect the limitations of our role as a federal habeas court, as our dissenting colleague repeatedly insists. Instead, our opinion recognizes only that Andrews's counsel's failure to put on any case in mitigation at the penalty phase of his capital trial—despite the ready availability of substantial and compelling mitigating evidence—represents the type of extreme malfunction in a state's criminal justice system that justifies federal court intervention. We have an unflinching obligation to correct constitutional errors of the magnitude present here. Under clearly established Supreme Court precedent, trial counsel's failure deprived Andrews of a fair sentencing proceeding, rendering Andrews's death sentence "unreliable." *Id.*

Accordingly, the California Supreme Court was objectively unreasonable in concluding there was no reasonable probability that *at least one juror* in Andrews's trial—in Los Angeles, in 1984—would have been persuaded that the violent and degrading abuse Andrews suffered *as a*

*child* at the hands of his state custodians—in segregated institutions in Alabama, in the mid-1960s—compelled some measure of mercy and a sentence of life without the possibility of parole, rather than death.

## V

We therefore **AFFIRM** the district court's grant of sentencing relief, **DISMISS** the Eighth Amendment lethal injection claim as unripe,[16] and **DENY** the request for a COA of Andrews's uncertified claims.

---

[16] Because California's lethal injection protocol was not in place at the time the district court ruled, the claim was unripe and the district court erred in entertaining it. *See Payton v. Cullen*, 658 F.3d 890, 893 (9th Cir. 2011).

**APPENDIX A**

Case: 09-99012    10/15/2014      ID: 9278330    DktEntry: 115-2    Page: 171 of 315    1990

THE COURT:  YOU MAY PROCEED, MR. LENOIR.

MR. LENOIR:  THANK YOU, YOUR HONOR.

IF IT PLEASE THE COURT, MR. FERNS, MR. MILLER, LADIES AND GENTLEMEN.

THIS WILL BE MY LAST OPPORTUNITY OF SAYING ANYTHING TO YOU IN REGARDS TO THIS MATTER.

ER000412

1991
Case: 09-99012    10/15/2014      ID: 9278330    DktEntry: 115-2    Page: 172 of 315

THIS IS THE STAGE OF THE CASE WHICH IS NOT A PLEASANT TASK FOR ANY OF US. FOR YOU AS JUDGES, MR. FERNS AS THE PROSECUTOR, MR. MILLER AND I IN ASKING YOU TO GIVE MR. ANDREWS LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE.

MR. FERNS IN HIS DISCUSSION WITH YOU MENTIONED THAT -- SOMETHING ABOUT GOD.

ANY SENTENCE YOU GIVE HIM NOW IS A DEATH SENTENCE WHETHER IT IS LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE OR DEATH.

ONE IS A SLOW DEATH IN WHICH GOD WILL NAME THE DATE OF EXECUTION; THE OTHER IS AN INSTANT DEATH WHICH A DATE WILL BE GIVEN SHOULD YOU GIVE HIM THE DEATH VERDICT.

EITHER WAY, IT'S A DEATH SENTENCE.

MR. FERNS USED A VERY SKILLFUL TECHNIQUE THAT IN REPEATING THINGS SO MANY TIMES IT SINKS IN. HE KEPT REPEATING THE FACT THAT HE HAD BEEN CONVICTED BACK IN ALABAMA AND HE KEPT REPEATING CERTAIN EVIDENCE THAT YOU HAVE ALREADY FOUND MR. ANDREWS GUILTY OF.

ER000413

1992
Case: 09-99012    10/15/2014    ID: 9278330    DktEntry: 115-2    Page: 173 of 315

HE'S CORRECT. AT THIS STAGE WE CANNOT CHALLENGE YOUR VERDICT. I'M NOT HERE CHALLENGING YOUR VERDICT. THIS IS NOT THE STAGE AT WHICH I CAN DO THAT OR AM ENTITLED TO DO THAT.

HE ALSO MENTIONED BUONO AND BIANCHI. THE HILL STREET -- I MEAN THE HILLSIDE KILLERS. THAT FAMOUS CASE THAT WAS TRIED JUST A FEW COURTS DOWN THE HALL, AND THE VERDICT CAME BACK LIFE WITHOUT THE POSSIBILITY OF PAROLE.

AND FOR THOSE OF YOU WHO KNOW THE FACTS IN THAT CASE, THERE WAS NOT ONLY THREE PEOPLE, IT WAS AT LEAST NINE STRANGLED OUT. NOT DOPE DEALERS. NINE PEOPLE MINDING THEIR OWN BUSINESS OUT ON THE STREETS. HAVE NOTHING TO DO WITH ANY NARCOTICS OR DOPE OR ANYTHING OF THAT NATURE AS FAR AS THE VICTIMS WERE CONCERNED.

WE MENTIONED TO YOU -- HE READ ALL OF THE THINGS THAT THE COURT WILL TELL YOU OF AGGRAVATING OR EITHER MITIGATING.

ONE FACTOR IN MITIGATION, HE WILL TELL YOU, IF YOU CONSIDER THAT, YOU CAN DETERMINE THAT YOU WANT TO LET THIS MAN DIE A SLOW DEATH.

HE MENTIONED AGE. AGE IS A FACTOR. NOW, AT THE TIME HE WAS CONVICTED IN ALABAMA, WE DON'T KNOW THAT ALABAMA, THERE IS NO EVIDENCE THAT ALABAMA HAD JUVENILE SYSTEM LIKE WE HAVE AND WAS CERTIFIED UP TO THE HIGHER COURT.

HE WAS JUST TAKEN IN AS A 15-YEAR-OLD, BOOM, AND TRIED.

THE REASON WE PRESENTED THE EVIDENCE OF THE STATEMENT OF QUARRELS -- SQUARES, RATHER, AND FREDDIE REED,

ER000414

Case: 09-99012   10/15/2014   ID: 9278330   DktEntry: 115-2   Page: 174 of 315

YOU'VE BEEN HEARING THAT NAME REED ALL THE WAY THROUGH THIS TRIAL, INCLUDING THE STATEMENT GIVEN BY ONE OF THESE TWO PEOPLE MENTIONING CAROL ANNE REED DOWN IN ALABAMA.

YOU WILL SEE THE AGES OF THE PERSONS THAT MR. ANDREWS WAS INVOLVED WITH AT THAT TIME, AND OF ALL THE PEOPLE HE WAS THE YOUNGEST. HE WAS 15, ONE IS 19, THE OTHER IS 17.

HE'S 29 AT THE TIME OF THIS PARTICULAR EVENT. YOU CAN TAKE THAT FACTOR INTO CONSIDERATION, BECAUSE AT 29 HE HAS A LONG LIFE EXPECTANCY, LONGER THAN MINE.

AND EVERY DAY, EVERY DAY SHOULD HE HAVE TO SUFFER THE SLOW DEATH AROUND THE CLOCK. THESE FACTS WILL ECHO IN HIS MIND.

YES, HE ESCAPED IN ALABAMA AT ABOUT 16 OR 17. BUT I CAN ASSURE YOU THAT HE WON'T ESCAPE FROM FOLSOM.

YOU KNOW, FOLSOM IS JUST ABOUT 30, 40 MILES OUT OF SACRAMENTO. IT'S A MEDIEVAL-TYPE PRISON, BIG GRANITE SLABS WITH GUARDS IN THE TOWERS WITH SUBMACHINE GUNS.

EVERYWHERE THE INMATES GO, THEY ARE REGIMENTED IN LINE SO FAR APART FROM EACH OTHER. THEY PUT THOSE WHO BEHAVE THEMSELVES TO WORK IN WORKSHOPS, INCLUDING MAKING LICENSE PLATES.

SO YOU CAN FEEL COMFORTABLE THAT AT HIS AGE, AND YOU CAN TAKE THAT INTO CONSIDERATION, THAT HE'S NOT GOING TO ESCAPE FROM FOLSOM, THAT'S FOR SURE.

THERE IS TWO SCHOOLS OF THOUGHT ON PENALTY AT THIS PHASE. I'VE HAD INMATES, AND MR. MILLER HAD ONE TO DO THE SAME THING, I DON'T WANT LIFE WITHOUT THE POSSIBILITY

ER000415

1994
Case: 09-99012    10/15/2014    ID: 9278330    DktEntry: 115-2    Page: 175 of 315

OF PAROLE. I CAN'T HAVE IT.

SO EITHER WAY HE'S GOING TO SUFFER THE DEATH PENALTY.

WE ALSO BROUGHT IN THE STATEMENTS FROM THE PARTICIPANTS IN THE AFFAIRS DOWN IN ALABAMA TO SHOW THAT HE WASN'T THE SHOOTER, BECAUSE JUST TO LEAVE IT OUT HERE THAT HE WAS CONVICTED OF SECOND DEGREE MURDER, THE FIRST THING THAT WOULD COME TO ONE'S MIND OR COULD LOGICALLY COME TO YOUR MIND, WELL, HE SHOT OR KILLED SOMEBODY ELSE.

HE PERSONALLY DID.

HE WAS CONVICTED ON AIDING AND ABETTING, AND FROM REALLY, I CAN'T GO BEHIND THAT JUDGMENT DOWN IN ALABAMA, BUT IF YOU LISTENED TO THOSE STATEMENTS, IT PRIMARILY SHOWS THAT FREDDIE SQUARE HAD PLANNED THIS THING AND HE WENT IN AND FREDDIE SQUARE PANICKED AND SHOT THE MAN.

ER000416

1995
Case: 09-99012    10/15/2014    ID: 9278330    DktEntry: 115-2    Page: 176 of 315

WE DID NOT PUT MR. ANDREWS ON IN ANY PHASE. YOU'RE NOT TO CONSIDER THE FACT THAT HE DIDN'T GET UP HERE AND ASK YOU TO GIVE HIM LIFE WITHOUT THE POSSIBILITY OF PAROLE OR NOT. YOU CAN'T CONSIDER THAT AND THE JUDGE IS GOING TO TELL YOU THAT.

YOU HAVE AN UNENVIABLE TASK. I SAY FROM THE FACT -- THE FACT ALONE THAT HE'S ONLY 29 YEARS OLD CAN BE SUFFICIENT IN MITIGATION FOR YOU TO CONSIDER. THAT ALONE.

WE KNOW HE'S NOT GOING TO DO ANYTHING ELSE NOW. WHICHEVER WAY WE GO. HE'S NOT GOING TO DO ANYTHING ELSE.

CONSIDER THE BACKGROUNDS AND THE PEOPLE THAT HE WAS -- THAT STARTED HIM ON WHATEVER CRIME HE COMMITTED.

THESE -- CAROLYN ANN BROOKS AKA CAROL REED; FREDDIE REED AND ALL OF HER RELATIVES. CAUGHT HIM WHEN HE WAS YOUNG DOWN IN ALABAMA.

AGAIN, I SAY WE -- ALTHOUGH SOME PEOPLE MAY SAY THEY DISAGREE WITH THE VERDICT, NO ONE CAN QUESTION YOUR VERDICT. THAT IS YOUR FINDING AND I'D BE THE LAST TO ATTEMPT TO QUESTION WHETHER I AGREED OR DISAGREED.

YOU ARE CONSCIENTIOUS AND YOU GAVE IT YOUR BEST EFFORT. I'M ASKING YOU NOW JUST ON AGE ALONE, I'M ASKING YOU NOW TO CONSIDER THAT IN MITIGATION.

THEN YOU CAN -- YOU DO THAT. YOU CAN JUSTIFY THE FINDING OF LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE.

I WISH I HAD A PICTURE OF FOLSOM. ONE OF THESE DAYS I'M GOING TO BLOW IT UP. GET A PICTURE OF IT AND SHOW

ER000417

Case: 09-99012    10/15/2014    ID: 9278330    DktEntry: 115-2    Page: 177 of 315

IT TO THE JURORS.

IT'S THE MOST AWESOME THING I HAVE EVER SEEN IN MY CAREER, AND I ALWAYS SAY THAT ANYONE THAT HAS A WAYWARD CHILD OR KNOWS OF A WAYWARD CHILD, TAKE HIM UP TO FOLSOM.

YOU COME OUT OF THOSE BEAUTIFUL HILLS AND, BOOM, THERE THIS ARCHAIC STRUCTURE STANDS.

YOU GO IN; YOU ARE THOROUGHLY SEARCHED. I FELT UNEASY IN THERE MYSELF.

GOD IS WATCHING EVERY MOVE THAT EVERYONE MAKES. THERE IS NO CHANCE OF ESCAPE IN FOLSOM.

AND I SAY SINCE MR. FERNS BROUGHT IT UP, IF BUONO AND BIANCHI CAN PREY ON WOMEN LIKE THEY DID AND STRANGLE THEM -- AND YOU SHOULD SEE SOME OF THE PICTURES IN THAT CASE.

I'M NOT CONDONING ANYTHING THAT WAS DONE HERE THAT YOU FOUND TO BE TRUE. NO ONE WOULD CONDONE IT.

BUONO GETS LIFE WITHOUT THE POSSIBILITY OF PAROLE. BIANCHI WENT FROM HERE TO WASHINGTON, THE STATE OF WASHINGTON.

THIS WASN'T A ONE DAY AFFAIR WITH THEM. THIS WAS A ONE INSTANT AFFAIR IN AN EFFORT TO OBTAIN SOME DOPE.

WHILE I'M ON THAT SUBJECT, THERE WAS EVIDENCE BY SANDERS HIMSELF THAT SAID THEY WERE SMOKING MARIJUANA. HE WAS GETTING HIGH.

WE DO KNOW THAT PATRICE BRANDON HAD PCP IN HER SYSTEM. WHICHEVER THEY WERE SMOKING, IF IT WAS PCP, EVERYBODY WAS AFFECTED BY IT. NO QUESTION ABOUT THAT.

JUST MARIJUANA. SANDERS SAID HE WAS GETTING HIGH AND THEY KEPT THE CIGARETTE GOING AROUND.

ER000418

Case: 09-99012    10/15/2014      ID: 9278330    DktEntry: 115-2    Page: 178 of 315

SO WHY COULDN'T YOU REASONABLY INFER THAT SO WAS JESSE ANDREWS?

I PRESENT THESE MATTERS TO YOU FOR YOUR CONSIDERATION. PLEASE LISTEN ATTENTIVELY TO THE INSTRUCTIONS THAT THE COURT WILL GIVE YOU. TAKE INTO CONSIDERATION THAT THIS YOUNG MAN IS ONLY 29 YEARS OLD; AND EVEN IF HE LIVES AS LONG AS I HAVE LIVED, 61 YEARS, HE HAS GOT A LOT OF THINKING TO DO, A LOT OF THINKING, A LOT OF SOUL SEARCHING.

ER000419

Case: 09-99012    10/15/2014       ID: 9278330    DktEntry: 115-2    Page: 179 of 315

1998

HE'S NOT GOING TO BE OUT LIKE SANDERS, IN WHATEVER NUMBER OF YEARS. SANDERS EXPECTS TO DO FOUR MORE, WHICH HE MAY.

EVEN IF SANDERS DID THE WHOLE 17, SANDERS GOT SOMETHING TO LOOK FORWARD TO. JESSE HAS NOTHING TO LOOK FORWARD TO BUT TO THINK ABOUT THIS CASE AND DO THE BEST HE CAN WHILE IN PRISON TO KEEP HIMSELF BUSY.

I SUGGESTED TO HIM THAT HE DO ALL HE CAN TO GET A JOB THAT WILL KEEP HIM OCCUPIED SO THAT HIS MIND WILL NOT SLIP OUT ON HIM AND GRIEVE HIMSELF TO DEATH.

I CONSIDER LIFE VERY PRECIOUS. THE LIVES OF THOSE VICTIMS ARE PRECIOUS, YOUR LIFE, MY LIFE, SANDERS' LIFE AND JESSE'S LIFE.

I STAND BEFORE YOU AT THIS TIME, AND I PLEAD WITH YOU TO FIND THAT AT LEAST ONE MITIGATING CIRCUMSTANCE IS SUFFICIENT FOR YOU TO GIVE THIS YOUNG MAN THE SLOW DEATH.

THANK YOU.

THE COURT: DO YOU WISH TO REBUT, MR. FERNS?

MR. FERNS: NO, YOUR HONOR.

THE COURT: OKAY.

"LADIES AND GENTLEMEN OF THE JURY, THE DEFENDANT IN THIS CASE HAS BEEN FOUND GUILTY OF MURDER IN THE FIRST DEGREE. THE CHARGE THAT THE MURDER WAS COMMITTED UNDER ONE OR MORE OF THE SPECIAL CIRCUMSTANCES HAS BEEN SPECIALLY FOUND TO BE TRUE.

"IT IS THE LAW OF THIS STATE THAT THE PENALTY FOR A DEFENDANT FOUND GUILTY OF

ER000420

N.R. SMITH, Circuit Judge, concurring in part and dissenting in part, with whom RAWLINSON and OWENS, Circuit Judges, join:

When will my colleagues quit ignoring the Supreme Court's repeated reminders to us that "[t]he role of a federal habeas court is to 'guard against extreme malfunctions in the state criminal justice systems'"? *Davis v. Ayala*, 135 S. Ct. 2187, 2202 (2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011)). That, under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), our role on habeas review is a limited one?

The California Supreme Court rigorously applied the test for evaluating prejudice in this context and reasonably concluded that Andrews was not prejudiced by his counsel's deficient performance during sentencing.[1] Because the California Supreme Court's conclusions regarding prejudice were not "beyond any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103, Andrews cannot establish prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984). As the California Supreme Court did not unreasonably apply *Strickland* or any other decision of the United States Supreme Court, no "extreme malfunction" occurred here. The majority errs in affirming the district court's grant of habeas relief.

In granting this relief, the majority repeats the same "fundamental errors that [the Supreme Court] has repeatedly admonished [us] to avoid." *Sexton v. Beaudreaux*, 138 S. Ct.

---

[1] In dissenting, I assume without deciding that Andrews's attorney was deficient during the penalty phase of his trial. Therefore, I limit my discussion to the other essential element of Andrews's ineffective assistance of counsel claim: prejudice. Further, the majority correctly determined that Andrews's Eighth Amendment claim is not properly before us, and that we need not reach Andrews's uncertified claims.

2555, 2560 (2018) (per curiam); *see also id.* ("[T]he Ninth Circuit failed to assess Beaudreaux's ineffectiveness claim with the appropriate amount of deference. The Ninth Circuit essentially evaluated the merits *de novo*, only tacking on a perfunctory statement at the end of its analysis asserting that the state court's decision was unreasonable."(emphasis in original)). Because "there is at least one theory that could have led a fairminded jurist to conclude" that Andrews was not prejudiced by his counsel's deficiencies, *id.* at 2259, the California Supreme Court did not unreasonably apply *Strickland* or any other clearly established federal law when it denied Andrews's ineffective assistance claim.[2]

## I.

A jury convicted Andrews of the murder of Preston Wheeler, Patrice Brandon, and Ronald Chism. *In re Andrews*, 52 P.3d 656, 657 (Cal. 2002). After hearing the stipulated facts regarding Andrews's criminal history during the penalty phase, the jury also found three special circumstances to be true. Two special circumstances related to the offense conduct: (1) multiple murder and robbery murder, based on the murders of Wheeler, Brandon, and Chism, and the robbery of Wheeler, and (2) rape murder, based on the rape and murder of Brandon. *Id.* at 658–59. The third special circumstance was Andrews's conviction for the murder of a grocery store clerk in 1967. *Id.* at 659.

---

[2] This dissent incorporates much of Judge Ikuta's well-reasoned panel majority decision, which I wholeheartedly joined. In particular, Section I & II largely repeats the relevant portions of the factual and procedural background section that Judge Ikuta authored for the panel majority. Likewise, Section III repeats many of the same arguments laid out by Judge Ikuta in the panel majority's decision. I am indebted to Judge Ikuta's hard work at the earlier stages of this appeal.

The penalty-phase presentations were brief. The prosecution presented evidence through a joint stipulation. *Id.* at 659–60. The stipulation provided that Andrews had previously been convicted of: (a) murder in 1967; (b) armed robbery in 1968; (c) escape in 1969; and (d) robbery in 1977. *Id.* at 659. The stipulation did not describe the facts of the offenses underlying these prior convictions. The prosecution also submitted photographs of Patrice Brandon and Ronald Chism as they were found by the police in the apartment; the photos "had been excluded from the guilt phase on the ground that they were unduly inflammatory." *Id.*

The defense evidence consisted of two sworn statements that were read to the jury. *Id.* The statements described facts underlying Andrews's 1967 conviction for murder. According to the statements, Andrews and a 17-year-old companion, both of whom were armed, attempted to rob a grocery store, and the companion fired three shots, which killed the grocery store clerk. *Id.*

In his closing argument, defense counsel focused on mitigating circumstances. He argued that Andrews's previous crimes were unsophisticated, occurred years apart, and all involved the unexpected escalation of a planned robbery. *Id.* He pointed out that Andrews was only 16 years old at the time of the murder of the grocery store clerk and was not the shooter. *Id.* He portrayed Andrews's conduct in the instant case as less blameworthy, because the murders occurred while Andrews, Andrews's co-defendant Charles Sanders, Wheeler, and Brandon were under the influence of illegal drugs. *Id.* at 659–60. Finally, he emphasized that murderers had received life without the possibility of parole in other cases despite a jury's finding of special circumstances and despite more blameworthy conduct. *Id.*

at 659. He also pointed out that, in this very case, Andrews's co-defendant Sanders received a sentence of only 17 years to life. *Id*. at 660. The prosecution offered no rebuttal.

After one day of deliberation, the jury returned a verdict and imposed the death penalty for each of the three murder counts. The California Supreme Court affirmed Andrews's conviction and his death sentences. *See People v. Andrews*, 776 P.2d 285 (Cal. 1989).

Andrews filed petitions for state post-conviction relief, claiming, among other things, that his counsel's assistance was ineffective at the penalty phase, because counsel did not adequately investigate and present mitigating evidence. The California Supreme Court denied all of Andrews's claims, except for his penalty phase ineffective assistance of counsel claim. *In re Andrews*, 52 P.3d at 659. Then, the California Supreme Court appointed a referee to take evidence and make factual findings on six questions related to that claim. Those questions are:

1. What mitigating character and background evidence could have been, but was not, presented by petitioner's trial attorneys at his penalty trial?

2. What investigative steps by trial counsel, if any, would have led to each such item of information?

3. What investigative steps, if any, did trial counsel take in an effort to gather mitigating evidence to be presented at the penalty phase?

4.  What tactical or financial constraints, if any, weighed against the investigation or presentation of mitigating character and background evidence at the penalty phase?

5.  What evidence, damaging to petitioner, but not presented by the prosecution at the guilt or penalty trials, would likely have been presented in rebuttal, if petitioner had introduced any such mitigating character and background evidence?

6.  Did petitioner himself request that either the investigation or the presentation of mitigating evidence at the penalty phase be curtailed in any manner?  If so, what specifically did petitioner request?

*Id.*

The referee received the testimony of more than 50 witnesses over the span of six years. *Id.* at 660.  In her report, the referee provided one-paragraph summaries and detailed factual findings in response to each question.  The California Supreme Court both summarized the referee's findings and explained the weight it gave to these findings.  *Id*. at 660–65.

**A.**

In response to the first question, the referee identified three broad categories of mitigating character and background evidence that was available but not presented to the jury: (1) Andrews's family background; (2) the

conditions of his confinement in a juvenile reform school and in the Alabama prison system; and (3) his mental health. *Id.* at 660–62.

## 1.

As for Andrews's family background, the referee's report found that, when Andrews was very young, his alcoholic parents separated and his mother left him to be raised by his grandparents and aunt in a large family home with his siblings and cousins. That family home was located in a poor, segregated neighborhood of Mobile, Alabama. *Id*. at 660. The referee described Andrews's grandfather as "loving, benevolent, and responsible." *Id.* The court added that Andrews's mother regularly sent money and clothing to her children, and that Andrews's upbringing and early family life were "relatively stable and without serious privation or abuse." *Id*. at 670. When Andrews was around nine or ten, his mother returned home with children from another marriage, making Andrews jealous. *Id*. at 660. Around that time Andrews's grandfather, a "pivotal figure" in his life, died. *Id*. Andrews became withdrawn, skipped school, and committed car theft at age 14. For that crime, he was sent to a reform school known as Mt. Meigs, formally the Alabama Industrial School for Negro Children. *Id*.

## 2.

As for the second category (the conditions at Mt. Meigs and in the Alabama prison system), the California Supreme Court recognized that "[a]t Mt. Meigs, [Andrews] encountered appalling conditions." *Id*. According to the referee's report, one witness described it as a farming operation and "a penal colony for children," while others described inhumane conditions, and severe beatings with, "among other things, broomsticks, mop handles, and fan

belts." *Id.* at 677 (Kennard, J., dissenting). The California Supreme Court also noted that the referee found that Andrews "was subjected to beatings, brutality, inadequate conditions and sexual predators." *Id.* at 660–61.

After his release from Mt. Meigs, Andrews began to associate with Freddie Square, an older boy with "manipulative and criminal tendencies." *Id.* at 661. In September 1966, three months after Andrews's release, Andrews and Square entered a grocery store, drew guns, and announced that they were conducting a robbery. *Id.* When "the store clerk placed his hand down the front of his apron," Square shot the clerk, killing him. *Id.* Andrews "acted as a lookout in the robbery, but played a more active role when he and Square robbed a taxi driver during their getaway" and used the taxi as a getaway car. *Id.* Andrews was convicted of murder (based on the grocery store incident) and later of armed robbery (of the taxi driver). *Id.* at 661 n.4. Andrews began serving his sentence in Alabama state prison just before he turned 18. *Id.* at 661. He escaped from prison and was convicted for that offense in 1969. *Id.* at 659. He remained in prison until 1976.

Summarizing the referee's findings about the prison conditions, the California Supreme Court stated:

> [The referee] described conditions in these institutions as abysmal, characterized by severe overcrowding, racial segregation, substandard facilities, no separation of the tougher inmates from younger or smaller inmates, constant violence, the persistent threat of sexual assaults and the constant presence of sexual pressure, the availability and necessity of weapons by all inmates, and degrading conditions in disciplinary

modules. [Andrews] not only received beatings but was also personally subjected to sexual assaults.

*Id*. at 661 (internal quotation marks omitted). The referee stated that Andrews "was rarely the instigator of violence," *id*. at 662, but had been "personally involved in violence including the stabbings of two inmates who had been threatening him." *Id*. at 661 (internal quotation marks and alterations omitted).

Shortly after his release from prison in 1976, Andrews engaged in an attempted robbery of a laundry. *Id*. The California Supreme Court noted the following testimony concerning the incident:

Mobile Police Officer Pettis testified that on March 23, 1977, he responded to a robbery call. Entering the store from which the call came, he and other officers saw [Andrews] holding a crying young woman hostage with a cocked gun at her head. He told the officers to leave and "continued to repeat, 'Someone's going to get shot, I'm going to shoot.'" The officers withdrew. Ultimately, [Andrews] surrendered to the officers after releasing the young woman and another woman whom he had also held hostage.

*Id.* at 665. Andrews was arrested and held in Mobile County Jail. *Id.* at 661. After a failed attempt to escape from the jail, he succeeded in escaping on his second try and fled to California. *Id*. at 661 n.5.

In California, Andrews met Debra Pickett, with whom he had a stable relationship. *Id*. at 661. The couple had a

child, and Andrews held a job during this time.  *Id*. However, by late 1979, Andrews had resumed using cocaine and left his job and family.  *Id*.  Soon after, he committed the three murders at issue here. *Id*.

### 3.

Summarizing the third category of potentially mitigating evidence not presented to the jury, the California Supreme Court noted that defense experts had diagnosed Andrews with a range of mental disorders, including attention deficit disorder, post traumatic stress disorder (PTSD), and mild to moderate organic brain impairment, in part due to drug use and possibly due to a head injury in prison.  *Id*.  The defense experts opined that Andrews's learning disability, the adverse circumstances of his childhood, the impact of the correctional systems, and the PTSD made his commission of the murders and sexual assault more understandable and less morally culpable.  *Id*. at 661–62.  The experts gave several specific examples of how Andrews's impairments and the brutal conditions of incarceration made it difficult for him to avoid getting into trouble with the law, and one concluded that Andrews was "affected by serious emotional disturbance when he committed the murders."  *Id*. at 680.

### B.

In addressing question five[3] ("What evidence, damaging to petitioner, but not presented by the prosecution at the guilt

---

[3] The California Supreme Court also recounted the referee's findings on questions two, three, and four.  These questions addressed the investigative steps trial counsel could have and actually did take to gather mitigating evidence for the penalty phase, and the constraints that weighed against the trial counsel investigating or presenting mitigating character and background evidence at the penalty phase.  Because I do

or penalty trials, would likely have been presented in rebuttal, if petitioner had introduced any such mitigating character and background evidence?"), the referee found that the prosecution's rebuttal presentation could have included evidence about two of Andrews's prior convictions. *Id.* at 664–65.

First, the prosecution could have presented testimony from the taxi driver in the 1968 robbery, who would have testified he heard Andrews say "[l]et's shoot him," after which Andrews fired at least two shots at the driver. *Id*. at 665. Second, the prosecution could have informed the jury about Andrews's attempt to rob a laundry business following his release from prison in 1976—a crime that involved holding two women hostage, one with a gun to her head. *Id*. The jury had heard that Andrews was convicted of these offenses, but it did not hear the facts on which the convictions were based; the prosecutor could have introduced a complete description of the underlying events as aggravating evidence to show Andrews's greater moral culpability for the rape and triple-murder.

Further, if Andrews's counsel had presented the expert opinions regarding Andrews's mental disorders, the referee determined that the prosecution could have called its own mental health experts to rebut Andrews's evidence. *Id*. The state could have presented expert testimony that Andrews did not suffer from PTSD, but rather suffered from antisocial personality disorder, that he resented authority, and had a normal-range IQ of 93. *Id*. A second state expert would have testified that Andrews's ability to hold a job and maintain a stable relationship with Debra Pickett before he committed the murders strongly indicated that he had not

---

not address the issue of deficient performance here, I largely do not address or discuss those findings.

suffered brain damage. *Id.* In addition, a prosecution expert would have testified that Andrews's "behavior on the night of the murders showed planning and thought, and it was therefore unlikely that [Andrews] was under the influence of PCP when he committed the murders." *Id.*

## C.

Regarding question six ("Did petitioner himself request that either the investigation or the presentation of mitigating evidence at the penalty phase be curtailed in any manner[, and,] [i]f so, what specifically did petitioner request?"), the California Supreme Court noted that the referee had concluded that there was no doubt that Andrews "adamantly" refused to allow counsel to approach his mother and family or to have them testify. *Id.* This conclusion was based on the trial records and the consistent testimony of witnesses at the reference hearing. *Id.* In response to specific questioning from the trial court "regarding his reluctance to have his mother called," and in the face of the trial court's advice that his mother's testimony would be valuable, Andrews "was very precise in his response, telling the judge that he fully understood and that this was his choice and no one else's." *Id.* (emphasis omitted). The referee further noted that the lead counsel, Gerald Lenoir, "represented on the record at trial that [Andrews] refused to have his mother called and that 'he "had his reasons," which Mr. Lenoir did not wish to disclose to the court.'" *Id.* The referee also found that "[Andrews] went so far as to threaten to disrupt the trial if his mother were called." *Id.* Andrews's opposition to having counsel involve his family was corroborated by his older sister and uncontradicted by his mother. *Id.*

## II.

As noted above, before ruling on Andrews's ineffective assistance claim, the California Supreme appointed a referee, a retired judge, who conducted an extensive investigative proceeding over the course of more than six years, during which time she took testimony from more than 50 witnesses. At the conclusion of that proceeding, the referee prepared and delivered to the California Supreme Court a lengthy report that both summarized the evidence it had taken and made factual findings concerning each of the issues identified by the California Supreme Court's reference order.

Andrews raised objections to many of the referee's findings. The court specifically addressed only two of them,[4] namely the referee's finding that: (1) the prosecutor would have introduced rebuttal evidence if the defense had offered the potentially mitigating evidence identified during the course of the reference hearing; and (2) Andrews did not want his family to testify during the penalty phase of his trial. *Id*. at 665–67. The California Supreme Court overruled both objections, finding them to be supported by both substantial evidence and the credibility determinations drawn by the referee based on the voluminous testimony the referee had heard during the reference proceeding. *Id*. at 666–67. With the objections addressed, the court recited and expressly adopted many of the referee's findings.

After considering "the record of the hearing, the referee's factual findings, and petitioner's original trial," the

---

[4] The California Supreme Court declined to rule on the remainder of Andrews's objections (or the objections to the referee's findings raised by the State), finding that the issues addressed by those other objections were "not material to [its] resolution of the petition." *Id.* at 665.

California Supreme Court concluded that "[Andrews] received constitutionally adequate representation, and any inadequacy did not result in prejudice." *Id.* at 659. Regarding prejudice, the California Supreme Court determined that, based on its review of the evidence adduced at the reference hearing and the rebuttal evidence that could have been introduced during the penalty phase, "it is not 'reasonably probable' [Andrews] was prejudiced by counsel's rejection of a defense premised on evidence of [Andrews]'s upbringing, the Alabama prison conditions he experienced, and his mental health in light of the circumstances of the crimes, given the ambiguous nature of some mitigating evidence and the substantial potential for damaging rebuttal." *Id.* at 671 (alterations and citation omitted) (quoting *Strickland*, 466 U.S. at 694).

In particular, the court concluded that much of the evidence identified by Andrews as mitigating "was not conclusively and unambiguously mitigating," and it evaluated the possibility that the evidence could be rebutted or used to Andrews's disadvantage, or that cross examination might "deflate the mitigating impact" of the evidence. *Id.* at 670 n.9. For example, the court observed that a jury could have determined that Andrews's family background did not reduce his moral culpability, given that Andrews was raised in a non-abusive, stable family situation. *Id.* at 670. The court therefore concluded that "[Andrews] did not suffer a home environment that would place his crimes in any understandable context or explain his resorting to crime every time he was released or escaped from prison." *Id.*

In addition, the California Supreme Court determined that the evidence regarding the prison conditions was essentially a double-edged sword. On the one hand, the

prison conditions evidence left "no doubt [that Andrews] endured horrifically demeaning and degrading circumstances." *Id.* at 670–71.  On the other hand, the evidence would be presented primarily through the testimony of Andrews's former fellow inmates, who had serious criminal records that could "draw[] an unfavorable comparison" with Andrews.  *Id*. at 671.  "Many had themselves engaged in brutality while in prison and escaped with some frequency," similar to Andrews.  *Id*.  Moreover, no matter how the prison conditions evidence was presented, "[r]ather than engendering sympathy, the evidence could well have reinforced an impression of him as a person who had become desensitized and inured to violence and disrespect for the law."  *Id*.

The California Supreme Court concluded that, based on the foregoing, any inadequacies in counsel's performance "did not result in prejudice."  *Id*. at 659.  Accordingly, the California Supreme Court denied Andrews's state habeas petition.  *Id*. at 676.  A federal habeas petition followed, which was granted by the district court.  It found that the California Supreme Court had unreasonably applied existing United States Supreme Court precedent concerning ineffective assistance of counsel claims.  This appeal followed.

## III.

Under AEDPA, an application for a writ of habeas corpus may not be granted:

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

This case involves the application of § 2254(d)(1) and asks whether the state court's decision was an unreasonable application of *Strickland*. This is a highly deferential standard. *See Richter*, 562 U.S. at 105 ("The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."(citations omitted)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (noting that AEDPA sets forth a "highly deferential standard . . . , which demands that state-court decisions be given the benefit of the doubt"(quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam))). "As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings," and instead only "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Richter*, 562 U.S. at 102.

"The pivotal question is whether the state court's application of the [relevant Supreme Court precedent] was unreasonable." *Id.* at 101. The Supreme Court has told us "time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Pinholster*, 563 U.S. at 202 (quoting *Richter*, 562

U.S. at 101); *see also Richter*, 562 U.S. at 102 ("[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."). Moreover, an "unreasonable application" of Supreme Court precedent is not one that is merely "incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *see also Williams v. Taylor*, 529 U.S. 362, 410 (2000). "Under § 2254(d), a habeas court must determine what arguments or theories supported" the state court's decision, *Richter*, 562 U.S. at 102, and if "'fairminded jurists could disagree' on the correctness of the state court's decision," that decision is not unreasonable. *Id*. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Beaudreaux*, 138 S. Ct. at 2559–60.

Therefore, it does not matter whether we would have reached a different result here than the California Supreme Court. Rather, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. "If this standard is difficult to meet, that is because it was meant to be." *Id*. at 102.

The clearly established federal law for ineffective assistance of counsel claims, as determined by the Supreme Court, is *Strickland* and its progeny. *See Pinholster*, 563 U.S. at 189; *see also Richter*, 562 U.S. at 102. *Strickland* concluded that, under the Sixth Amendment, the accused has the right to the effective assistance of counsel at trial and during capital sentencing proceedings. 466 U.S. at 684–87. A petitioner claiming ineffective assistance of counsel must prove that: (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *Id*.

at 687. However, when a *Strickland* claim is considered through AEDPA's deferential lens, "[t]he likelihood of a different result must be substantial, not just conceivable," to establish prejudice. *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693).

As previously indicated, I limit this analysis to the second essential element of Andrews's ineffective assistance claim: prejudice. Determining whether counsel's deficient performance prejudiced the defense at the penalty phase of a capital case generally proceeds through three steps. First, the court must evaluate and weigh the totality of the available mitigation evidence. *See Williams*, 529 U.S. at 397–98; *Pinholster*, 563 U.S. at 197–202. Second, the court must evaluate and weigh the aggravating evidence and any rebuttal evidence that could have been adduced by the government had the mitigating evidence been introduced. *See Williams*, 529 U.S. at 397–98; *Pinholster*, 563 U.S. at 197–202. Third, the court must re-weigh the evidence in aggravation against the totality of available mitigating evidence to determine "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see also Sears v. Upton*, 561 U.S. 945, 955–56 (2010) (per curiam); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). The California Supreme Court carefully applied this framework and drew conclusions that are supported by the evidence.[5] Let me explain.

---

[5] The majority states that the California Supreme Court "dispensed with its [prejudice] analysis in two sentences." Maj. Op. at 39. The majority also charges that court with "improper[ly] conflat[ing]" the deficiency and prejudice analyses. *Id.* However, these statements

## A.

The California Supreme Court considered the totality of the mitigating evidence presented at trial, as well as what mitigating evidence could have been presented by a competent attorney, based on the factual findings made by the referee at the conclusion of the referee's six-year investigation. *See Williams*, 529 U.S. at 397–98. The court reviewed all of the mitigating evidence that Andrews presented, including: Andrews's family background, incarceration in Mt. Meigs and in Alabama prisons, and mental health evidence. *See In re Andrews*, 52 P.3d at 670–71.

The California Supreme Court then evaluated the strength of this mitigating evidence by considering, among other things, whether it might be viewed by a jury as aggravating. *See Burger v. Kemp*, 483 U.S. 776, 793 (1987); *Pinholster*, 563 U.S. at 201–02. As noted previously, the court concluded that much of the evidence identified as mitigating was not unambiguously mitigating, and the court

---

simply misrepresent the California Supreme Court's analysis. For example, the California Supreme Court spent page upon page discussing the double-edged nature of the mitigating evidence defense counsel could have introduced. *See In re Andrews*, 52 P.3d at 668–72. That the California Supreme Court relied on this evidence in analyzing whether defense counsel was deficient does not preclude the court from then relying on that same evidence in its prejudice analysis; nor does it mean that the court somehow conflated the two analyses merely because the same evidence goes to each prong. Instead, *Sears v. Upton*—the case the majority relies upon in making its assertion in this regard—simply stands for the proposition that courts should not foreclose that a potentially mitigating factor might satisfy one prong of the analysis just because it fails to satisfy the other. *See* 561 U.S. at 954 n.10. *Sears* thus in no way bars courts from relying on the same facts in conducting its analysis of each prong of the ineffective assistance test, as the California Supreme Court did in this case.

also noted the possibility that the evidence could have been rebutted or used to Andrews's disadvantage.  *See In re Andrews*, 52 P.3d at 670 n.9.

The California Supreme Court observed that a jury could have determined that Andrews's family background did not reduce his moral culpability, given that Andrews was raised in a non-abusive, stable family situation.  *Id*. at 670.  Based on that observation, the court concluded that "[Andrews] did not suffer a home environment that would place his crimes in any understandable context or explain his resorting to crime every time he was released or escaped from prison." *Id.*  This conclusion was not unreasonable.  Evidence of a difficult upbringing can be useful in mitigation, but the opposite is also true.  *See Bell v. Cone*, 535 U.S. 685, 701– 02 (2002) (observing that evidence of a normal youth might "cut the other way").  At the very least, this determination was not so lacking in justification that it was an error beyond any fairminded disagreement.  *See Richter*, 562 U.S. at 103.

In addition, the California Supreme Court determined that the evidence regarding the prison conditions was double-edged.   On the one hand, the prison conditions evidence left "no doubt [that Andrews] endured horrifically demeaning and degrading circumstances."  *In re Andrews*, 52 P.3d at 670.  On the other hand, the evidence would be presented primarily through the testimony of Andrews's former fellow inmates, who had serious criminal records that could "draw[] an unfavorable comparison" with Andrews. *Id*. at 671.  "Many had themselves engaged in brutality while in prison and escaped with some frequency," similar to Andrews.   *Id.*   Though the majority notes that this information could have been discovered through "standard legal research" and a review of then existing lawsuits, Maj. Op. at 25, it does not explain how this information, once

discovered, could have been introduced without offering similar unfavorable comparisons for the jury to draw. Even if this evidence could be introduced through some means other than inmate testimony, no matter how this evidence was presented, "[r]ather than engendering sympathy, the evidence could well have reinforced an impression of [Andrews] as a person who had become desensitized and inured to violence and disrespect for the law." *In re Andrews*, 52 P.3d at 671; *cf. Pinholster*, 563 U.S. at 201–02.

The majority also claims that the California Supreme Court was unreasonable in concluding that the Mt. Meigs evidence could have cut both ways, because "[t]he jury already knew, from Andrews's heinous crimes of conviction and from the stipulated prior convictions, that Andrews was antisocial and 'had become desensitized and inured to violence and disrespect for the law.'" Maj. Op. at 47 (quoting *In re Andrews*, 52 P.3d at 671). However, the majority mischaracterizes the evidence before the jury in this proceeding. The stipulation presented to the jury did not describe the facts of each of the offenses underlying Andrews's prior convictions. As a result, the jury did not hear that Andrews held a woman hostage with a gun to her head when robbing a laundry business. *In re Andrews*, 52 P.3d at 665. Nor did it hear that the taxi driver in the 1968 robbery heard Andrews say "[l]et's shoot him," after which Andrews fired at least two shots at the driver. *Id.*

These details, had they been introduced during the sentencing proceeding to rebut testimony concerning the conditions of Andrews's confinement, could have further underscored that Andrews was a repeat violent offender who had long ago lost any respect for the law. The California Supreme Court's determination that evidence relating to Mt. Meigs and the other facilities in which Andrews was

incarcerated was not conclusively and unambiguously mitigating and could cut both ways was thus not an unreasonable determination, nor is it beyond the scope of fairminded disagreement.

## B.

The California Supreme Court also evaluated the weight of the aggravating evidence at trial, as well as any additional rebuttal evidence that could have been introduced. *See Williams*, 529 U.S. at 397–98; *Wong v. Belmontes*, 558 U.S. 15, 20, 24–28 (2009) (per curiam). Based on that assessment, the California Supreme Court determined that the aggravating evidence introduced against Andrews was overwhelming, even without considering the rebuttal evidence that the prosecutor could have (but did not) introduce during the sentencing proceeding.

Turning to the circumstances of Andrews's crimes, the California Supreme Court stated that the murders showed a "callous disregard for human life." *In re Andrews*, 52 P.3d at 671. Andrews did not impulsively react to a situation that got out of hand; rather, he interacted with the victims in a calm and normal manner before torturing and killing them. *Id*. He also did more than simply kill the victims. He raped and sodomized Brandon before killing her, and he killed Wheeler and Chism with "considerable violence and evident sangfroid." *Id.*

The California Supreme Court also noted that, as rebuttal evidence, the prosecution could have presented the details of Andrews's criminal history, *cf. Cone*, 535 U.S. at 700 n.5; *Burger*, 483 U.S. at 793, from which the jury might conclude Andrews was "aggressive and desensitized to violence," *In re Andrews*, 52 P.3d at 669. The court also determined that a jury may have concluded that this "pattern of criminality"

showed Andrews "would pose a danger to others if he were sentenced to life imprisonment."**[6]** *Id.* In light of these facts, the California Supreme Court reasonably determined that the government had produced significant evidence of numerous extremely serious aggravating circumstances.

The California Supreme Court further noted that, had Andrews offered expert testimony suggesting that his prison experience caused him to react with rage to perceived insults, the prosecutor could have quite conceivably used that same mental health evidence to Andrews's disadvantage on cross examination. *Id.* at 670. That is, such testimony could have also plausibly convinced the jury that Andrews "was unable to control lethal impulses on the slightest provocation." *Id.*; *cf. Pinholster*, 563 U.S. at 201–02. Moreover, the presentation of the mental health evidence would also have given the prosecutor additional opportunities to repeat the circumstances of these crimes as well as Andrews's past criminality. *In re Andrews*, 52 P.3d

---

**[6]** Andrews argues that the California Supreme Court's conclusion that the evidence gave rise to the inference of future dangerousness was an unreasonable determination of the facts. He argues that the prison stabbings, laundry robbery, and conditioning to violence during his prison experiences do not support such an inference, pointing to mitigating facts found by the referee, including that (in some incidents) Andrews was defending himself against inmates who had been threatening him. I disagree. The California Supreme Court considered these mitigating facts, such as evidence that in prison Andrews was "the prey rather than the predator" and acted in self defense, *see id.* at 679, and reasonably concluded that evidence showing that Andrews was conditioned to violence during his prison experiences was an aggravating, not mitigating, circumstance. *See Burger*, 483 U.S. at 793 (noting that evidence of a petitioner's troubled family background could also "suggest violent tendencies" that could affect the jury adversely). Because the state court reasonably concluded that the jury could have found future dangerousness even had the mitigating evidence been introduced, the state court did not unreasonably apply Supreme Court precedent in weighing how this evidence might impact a jury.

at 670. Finally, the court also pointed out, based on the referee's findings, that prosecution experts could have testified that Andrews had normal intelligence and did not suffer brain damage, but had antisocial personality traits. *Id.*; *cf. Pinholster*, 563 U.S. at 201.

These findings are supported by the California Supreme Court record. The California Supreme Court did not unreasonably determine that the state was poised to introduce rebuttal testimony that, if anything, could have provided further evidence of aggravating circumstances or considerations.

## C.

After evaluating the mitigating and aggravating evidence, the California Supreme Court re-weighed and assessed whether it was reasonably probable that, in the absence of any deficient performance by counsel, the sentencer "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see also In re Andrews*, 52 P.3d at 671–76. The state court applied the relevant Supreme Court precedent and concluded it was not reasonably probable that Andrews was "prejudiced by counsel's rejection of a defense premised on evidence of [Andrews]'s upbringing, the Alabama prison conditions he experienced, and his mental health in light of the circumstances of the crimes, given the ambiguous nature of some mitigating evidence and the substantial potential for damaging rebuttal." *Id.* at 671. Accordingly, the California Supreme Court concluded that, even if counsel were deficient, Andrews's defense was not prejudiced by any such deficiency. *Id.*

The majority finds that this was an unreasonable application of *Strickland*; the majority errs. Much as was the case in *Richter*, the majority has "treated the unreasonableness question as a test of its confidence in the result it would reach under *de novo* review: Because the Court of Appeals had little doubt that [Andrews's] *Strickland* claim had merit, the Court of Appeals concluded the state court must have been unreasonable in rejecting it." 562 U.S. at 102 (emphasis in original). This is not the appropriate test under AEDPA, a fact of which the Supreme Court has reminded the Ninth Circuit on numerous occasions. *See*, *e.g.*, *Beaudreaux*, 138 S. Ct. at 2559–60; *Ayala*, 135 S. Ct. at 2202 ("[T]he members of the panel majority misunderstood the role of a federal court in a habeas case."); *Nevada v. Jackson*, 569 U.S. 505, 512 (2013) (per curiam) ("In thus collapsing the distinction between 'an *unreasonable* application of federal law' and what a lower court believes to be 'an *incorrect or erroneous* application of federal law,' the Ninth Circuit's approach would defeat the substantial deference that AEDPA requires." (citation omitted)); *Cavazos v. Smith*, 565 U.S. 1, 8 (2011) (per curiam) (same); *Pinholster*, 563 U.S. at 202–03 ("Even if the Court of Appeals might have reached a different conclusion as an initial matter, it was not an unreasonable application of our precedent for the California Supreme Court to conclude that Pinholster did not establish prejudice."); *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (same); *Premo v. Moore*, 562 U.S. 115, 123 (2011) (same). Rather, the majority should have applied this standard: Where, after determining "what arguments or theories supported" the state court's decision, *Richter*, 562 U.S. at 102, "'fairminded jurists could disagree' on the correctness of the state court's decision," that decision is not objectively unreasonable, *id*. at 101 (quoting *Yarborough*, 541 U.S. at 664).

And in this case, reasonable jurists could disagree on the correctness of the conclusion drawn by the California Supreme Court. The evidence that Andrews argues should have been introduced at sentencing could have conceivably persuaded the jury to impose a sentence other than death. However, a mere possibility of a different outcome is not enough. *See Richter*, 562 U.S. at 111–12. Rather than apply the appropriate level of deference required under AEDPA, the majority steps into the shoes of the dissenting justice of the California Supreme Court in this case and essentially applies *Strickland* de novo. Indeed, the majority even makes its own factual findings when it determines that the prosecution would not have introduced rebuttal witnesses had the defense presented evidence of Andrews's prison conditions. Yet this finding discounts the substantial rebuttal evidence that the California Supreme Court and the referee found could have been introduced. *See In re Andrews*, 52 P.3d at 665–66. Under AEDPA, such review is erroneous. In taking this approach, the majority has ignored "the only question that matters under § 2254(d)(1)," *Lockyer*, 538 U.S. at 71, namely, whether the state court's application of the clearly established Supreme Court precedent was *objectively unreasonable*.

To make matters worse, the ink is barely dry on a Supreme Court decision reminding our circuit that habeas relief is not appropriate under AEDPA when a *single theory* exists that supports the result adopted by the state court. *See Beaudreaux*, 138 S. Ct. at 2559–60. Such a theory exists here, and it was articulated by the California Supreme Court: If introduced, the potentially mitigating evidence at issue could quite possibly have had the opposite of the intended effect, *both* because it paled in comparison to the nearly overwhelming aggravating evidence adduced by the state both during trial and at sentencing, *and* because its

introduction would have offered the prosecutor an opportunity to re-visit the gruesome nature of Andrews's crimes on cross-examination, and to introduce in rebuttal some or all of the additional aggravating evidence it had in its possession. As a result, the California Supreme Court determined that it was not reasonably probable that a different outcome would have occurred, but for counsel's errors.

The majority purports to recognize AEDPA's highly deferential standard, but fails to apply it. Just because we may have concluded otherwise had we been sitting on the California Supreme Court, we do not have license to second guess that court's well-reasoned decision. Instead, because fairminded jurists can disagree regarding the correctness of the state court's application of *Strickland* to Andrews's penalty phase ineffective assistance claim, we are bound by AEDPA and binding Supreme Court precedent to conclude that Andrews is not entitled to habeas relief on that issue.

**D.**

Andrews also argues that the California Supreme Court's decision unreasonably applies not only *Strickland*, but two other Supreme Court decisions as well: *Williams* and *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam).[7] Unfortunately, the majority accepts this argument.

---

[7] The majority also argues that the California Supreme Court erroneously relied on the Supreme Court's decision in *Burger*, though it does so in the context of its discussion of counsel's deficient performance, not its discussion of prejudice. *See* Maj. Op. at 32–34. *Burger* supports the California Supreme Court's finding of no prejudice. In *Burger*, the Supreme Court found that counsel was not deficient for failing to present double-edged mitigating evidence that would have

The California Supreme Court discussed *Williams* at length and distinguished it as having "substantially dissimilar facts." *In re Andrews*, 52 P.3d at 674–75. The California Supreme Court correctly determined that Andrews's case and *Williams* are distinguishable.

The majority suggests that Andrews's childhood was comparable to the "nightmarish childhood" described in *Williams*, 529 U.S. at 395, largely due to Andrews's experiences at Mt. Meigs, Maj. Op. at 31, 43. The record before us does not support such a conclusion. Had counsel adequately investigated Williams's background, he would have discovered documents that "dramatically described mistreatment, abuse, and neglect during [Williams's] *early childhood*," *id*. at 370 (emphasis added), before Williams was removed (at least temporarily) from his abusive home at age 11, *Id*. at 370, 395. Andrews's early childhood, in contrast, was spent in a relatively stable and non-abusive household, *see In re Andrews*, 52 P.3d at 670, a fact that the majority has not even attempted to challenge or dispute. Despite that stable upbringing, Andrews dropped out of school and stole a car at the age of 14, after which he was removed from home and placed in Mt. Meigs. Andrews experienced appalling conditions and treatment at Mt. Meigs, but his experiences at Mt. Meigs while a teen are simply not the same as the abuse that Williams suffered at so young an age at the hands of his parents. Thus, the

introduced damaging facts to the jury and suggested "violent tendencies." 483 U.S. at 793–95. The California Supreme Court reached the same conclusion as *Burger*, i.e., that Andrews's mitigating evidence would negatively affect a jury because it would have allowed "the introduction of substantial aggravating evidence . . . that could have undermined the defense by depicting [Andrews] as aggressive and desensitized to violence." *In re Andrews*, 52 P.3d at 669 (citing *Burger*, 483 U.S. at 794–95). This conclusion was neither erroneous, nor was it an unreasonable application of *Burger*.

California Supreme Court reasonably determined that the abuse described here is not comparable to the abuse and "nightmarish childhood" described in *Williams*.

Moreover, even assuming that the California Supreme Court was essentially bound to conclude that the mistreatment described here is the same as the mistreatment described in *Williams*, there are a number of other reasons why *Williams* and this case are distinguishable. First, in *Williams*, defense counsel could have introduced strong character evidence regarding his exemplary conduct in prison, 529 U.S. at 398, but no comparable evidence of good character was present in Andrews's case. The defendant in *Williams* was "borderline mentally retarded," *Id*. at 396, 398, while the prosecution could have presented evidence that Andrews had an average IQ and antisocial personality traits. *In re Andrews*, 52 P.3d at 670. Although the prosecutor in *Williams* could have introduced rebuttal evidence that the defendant "had been thrice committed to the juvenile system—for aiding and abetting larceny when he was 11 years old, for pulling a false fire alarm when he was 12, and for breaking and entering when he was 15," 529 U.S. at 396—such evidence has much less weight compared to Andrews's robbery-murder, hostage taking, and history of escapes from prison, *In re Andrews*, 52 P.3d at 675. Finally, the circumstances of the crime in *Williams*, where the defendant admitted that he had killed a man by striking him in the chest and back after an argument, were far less brutal than Andrews's rape and triple murder. *Id.*[8]

---

[8] The majority suggests that the California Supreme Court unreasonably compared the aggravating facts of Andrews's case to mitigating facts in *Williams*. Maj. Op. at 42. However, AEDPA requires that, whenever possible, we must "read [the state court] decision to

The majority fails to engage with these distinctions and the evidence at issue.  Instead, the majority reviews this issue de novo and concludes that the aggravating evidence admitted at trial and the evidence that could have been offered in rebuttal against Andrews was no greater than the aggravating evidence in *Williams*.  Maj. Op. at 42–44.  Once again, the majority misapprehends our role under AEDPA. We must determine whether the California Supreme Court's application of *Williams* was objectively unreasonable under 28 U.S.C. § 2254(d)(1), not whether we would have reached a different result if we were in the California Supreme Court's position.  "In order for a state court's decision to be an unreasonable application of [the Supreme] Court's case law, the ruling must be 'objectively unreasonable, not merely wrong; even clear error will not suffice.'"  *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (per curiam) (quoting *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam)).[9]  Because the facts of *Williams* are dissimilar, the

---

comport with clearly established federal law."  *Mann v. Ryan*, 828 F.3d 1143, 1158 (9th Cir. 2016) (en banc).  That can easily be done here.  The California Supreme Court drew this particular comparison to illustrate why the facts at issue in *Williams* and the facts at issue here are distinct, and thereby illustrate why these cases are distinguishable.  As the discussion above demonstrates, this determination is amply supported by a careful reading of *Williams* and the facts of the case before us.  The majority errs when deciding that the California Supreme Court unreasonably applied *Williams* on this basis.

[9] The majority also relies on Justice Rehnquist's opinion in *Williams*, which described additional aggravating factors beyond the crime itself.  *See* Maj Op. at 42 (citing *Williams*, 529 U.S. at 418 (Rehnquist, C.J., concurring in part and dissenting in part)).  But under AEDPA, neither concurring nor dissenting opinions, nor circuit court decisions, constitute clearly established Supreme Court precedent.  *See Williams*, 529 U.S. at 412 (majority opinion) (stating that only the Supreme Court's "holdings, as opposed to the dicta" constitute clearly

Supreme Court's determination in *Williams* that counsel's ineffective assistance was prejudicial does not make the state court's contrary conclusion here unreasonable. *See Richter*, 562 U.S. at 101–02; *see also Pinholster*, 563 U.S. at 202–03.

Andrews also argues that the California Supreme Court's decision was unreasonable in light of *Porter*. The majority appears to agree, finding that (as in *Porter*) habeas relief is appropriate here even though in both cases the prosecutor presented "a strong case in aggravation." Maj. Op. at 44. These cases are not remotely comparable. For one thing, the aggravating evidence in this case is considerably stronger than the aggravating evidence that was at issue in *Porter*. A jury convicted Porter of two murders and, following a penalty phase trial, recommended a sentence of death for each murder. *Porter*, 558 U.S. at 31–32. The Florida Supreme Court affirmed, but also noted that the evidence was "consistent with the hypothesis that Porter's was a crime of passion, not a crime that was meant to be deliberately and extraordinarily painful," *id*. at 33, and also that Porter had been "drinking heavily just hours before the murders," *id.* at 38. Here, by contrast, there is no evidence showing that Andrews's crimes were committed in the heat of passion. To the contrary, the California Supreme Court found that Andrews did not impulsively react to a situation that got out of hand; instead, he interacted with the victims in a calm and normal manner before torturing them, raping Brandon, and ultimately killing each of them in cold blood. *See In re Andrews*, 52 P.3d at 671.

---

established Federal law); *cf. Glebe v. Frost*, 574 U.S. 21, 24 (2014) (per curiam) ("As we have repeatedly emphasized, however, circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" (quoting 28 U.S.C. § 2254(d)(1))).

*Porter* also strongly criticized the Florida Supreme Court's consideration of the potentially mitigating evidence that was produced during the post-conviction relief proceeding conducted there. 558 U.S. at 43 (observing that the Florida Supreme Court had "discount[ed] to irrelevance the evidence of Porter's abusive childhood"). The California Supreme Court did not repeat that same mistake here. Further, the mitigation evidence produced here is not similar to the evidence considered in *Porter*. The most important mitigation evidence in *Porter*, that the defendant served in "two of the most critical—and horrific—battles of the Korean War," *see id*. at 41, is far stronger than the mitigation evidence at issue here. And Andrews did not have an abusive home life, while Porter had a childhood history of physical abuse, during which he was subjected to routine beatings and regularly watched his father beating his mother. *Id*. at 33. Moreover, there is no evidence that the murders Andrews committed were crimes of passion for which childhood abuse would have "particular salience for a jury" in evaluating his behavior. *See id*. at 43. Because *Porter* is factually distinct from this case, the majority errs in determining that the state court unreasonably applied it in connection with its determination that Andrews could not establish prejudice under *Strickland*.[10]

---

[10] It is worth noting that the majority has overlooked a Supreme Court decision that is a closer fit to the facts considered here by the California Supreme Court: *Woodford v. Visciotti*, 537 U.S. 19 (2002) (per curiam). In *Visciotti*, the Supreme Court explained that "under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly." *Id*. at 27 (internal quotation marks omitted). Rather, "[t]he federal habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-court intervention only when a state-court decision is objectively unreasonable." *Id*. In sum, the Court

The majority purports to recognize that "our deference to state court decisions is at its zenith on federal habeas review," Maj. Op. at 5, but fails to apply this standard. Here, the California Supreme Court determined that it was not reasonably probable that the outcome would have been different in this case had the evidence adduced at the reference hearing (along with the rebuttal evidence) been presented to the jury. *In re Andrews*, 52 P.3d at 675–76. Because the state court's rejection of Andrews's penalty phase ineffective assistance of counsel claim was not contrary to or an unreasonable application of Supreme Court precedent, AEDPA bars relief on that claim.

## IV.

The majority frames its conclusions in the terms required by AEDPA and declares that its prejudice findings are beyond any fairminded disagreement. It simply never explains why no reasonable jurist could come out the other way. The majority yet again makes the same error that the Supreme Court has repeatedly corrected in Ninth Circuit jurisprudence. It essentially reviews the California Supreme Court's decision de novo and grants relief that is barred under AEDPA. Applying the proper measure of deference,

---

held that "[w]hether or not we would reach the same conclusion as the California Supreme Court, we think at the very least that the state court's contrary assessment was not 'unreasonable.'" *Id.* (quoting *Cone*, 535 U.S. at 701). Here, as in *Visciotti*, the state court re-weighed Andrews's mitigating evidence against the brutal circumstances of the crime and Andrews's prior criminal history, and determined there was no reasonable probability that the sentencer would determine that "the balance of aggravating and mitigating factors did not warrant imposition of the death penalty." *Id.* at 22 (internal quotation marks omitted). This decision was not objectively unreasonable. We must then conclude that "[w]hether or not we would reach the same conclusion," we simply cannot say the California Supreme Court's conclusion was an unreasonable application of *Strickland*. *See id.* at 27.

we can only conclude that the California Supreme Court did not unreasonably apply *Strickland* when it rejected Andrews's penalty phase ineffective assistance of counsel claims. We should reverse the district court's grant of habeas relief on Andrews's penalty phase *Strickland* claim.